UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
TULLIE HYMAN,

                                Petitioner,                          **MEMORANDUM & ORDER**

                -against-                                            10 CV 4065 (RJD)

WILLIAM D. BROWN, Superintendent,
    Eastern Correctional Facility,

                Respondent.

-----------------------------------------------------X
DEARIE, District Judge.


# TABLE OF CONTENTS

I.   OVERVIEW ...................................................................................................... 2
II.  "ALL THE EVIDENCE, OLD AND NEW . . ." .............................................. 11
A.   The Trial........................................................................................................... 11
        1.      Openings ................................................................................... 11
        2.      Eyewitnesses other than Ellis................................................. 13
                a.  Margaret Contreras and Shereda Freeman ....................... 13
                b.  Lynn Burton .................................................................... 16
                c.  Deborah McCoy ............................................................... 17
        3.      Shaquana Ellis's Trial Testimony............................................ 18
                a.  Direct Examination........................................................... 18
                b.  Cross-Examination ........................................................... 22
        4.      Police Witnesses ...................................................................... 26
                a.  Ballistics ........................................................................... 26
                b.  Hyman's Statements; Recovery of the Mazda and the Acura............ 29
        5.      Hyman's Grand Jury Testimony............................................... 32
        6.      The 911 calls............................................................................ 33
        7.      Defense Case............................................................................. 33
        8.      The Jury Charge on Accessorial Liability ............................... 34
        9.      Verdict....................................................................................... 35
        10.     Sentencing................................................................................ 36
B.   State and Appellate Post-Conviction Proceedings............................................ 37

|   |   | 1. | Direct Appeal | 37 |
|   |   | 2. | First State Post-Conviction Motion | 38 |
|   |   | 3. | The Second 440 | 39 |
|   |   | 4. | Coram Nobis | 46 |

C. The Federal Habeas Proceeding .......................................................... 47

| 1. | Hyman's Case | 48 |

| a. | Shaquana Ellis | 48 |
| b. | Amanda Benitez | 57 |
| c. | Shaquana Delain | 64 |
| d. | Private Investigator Kevin Hinkson | 66 |

| 2. | The Prosecution's Rebuttal | 67 |

| a. | Threshold Legal Concern | 67 |
| b. | The Prosecution's Rebuttal Evidence | 72 |

| i. | Whitmore's Statement | 72 |
| ii. | Joseph Howard | 76 |

III. STANDARDS AND FINDINGS ............................................................ 78

A. Actual Innocence ................................................................................. 78
1. Generally ............................................................................................. 78

| 2. | The "Credible" Prong | 79 |
| 3. | "Compelling" | 83 |

B. Ineffective Assistance of Counsel ....................................................... 85

| 1. | Legal Standard | 85 |
| 2. | Analysis | 87 |

IV. CONCLUSION .................................................................................... 91

# I.    OVERVIEW

Since June 2002, petitioner Tullie Hyman has been in custody on his sentence of 21 years to life for his conviction of second-degree murder, weapons possession and reckless endangerment.  The charges arose out of a multiple-participant shooting in front of an apartment building that resulted in the tragic death of an innocent bystander inside the building's lobby.

Before the Court is Hyman's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] He claims that he was denied his Sixth Amendment right to the effective assistance of counsel because his attorney possessed strong exculpatory evidence but chose, because of a fee dispute with the investigator who produced the evidence rather than for strategic reasons, not to introduce it at trial. Recognizing that this claim is barred from federal review because the state court denied it in the first instance on state procedural grounds, Hyman also advances, in an attempt to lift the bar, a gateway claim of actual innocence premised on the consistent recants offered by Shaquana Ellis, the only witness to implicate him at trial.[2] Indeed, outside the four corners of this infrequently invoked procedural claim, Hyman has steadfastly maintained his factual innocence since voluntarily surrendering to police the morning after the shooting more than sixteen years ago.

Hyman's petition presents an especially challenging state court record that raises concerns about his trial and post-conviction proceedings. Among other things, (i) as a factual matter Hyman's ineffectiveness allegation appears to be true—it is undisputed that his attorney failed to present key exculpatory evidence to the jury that would have undermined Ellis's credibility, and the proof is unrefuted that counsel did so because of a fee dispute with the

---

[1] Upon review of the state court record, the Court appointed counsel to represent Hyman. Although the initial petition advanced eight separate claims for relief, Hyman, through counsel, subsequently abandoned all but the two addressed in this opinion.

[2] Despite its title, this type of innocence claim is entirely "procedural, rather than substantive," Schlup v. Delo, 513 U.S. 298, 314 (1995), advanced solely as a means of allowing the Court to reach a procedurally barred substantive claim. Schlup, 513 U.S. at 315 (holding that actual innocence claim is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits") (internal quotation and citation omitted); House v. Bell, 547 U.S. 518, 536-540 (2006) (explaining the Schlup standard); McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) (holding that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar. . . or expiration of the statute of limitations").

defense investigator rather than for any reason that could be called "trial strategy"; (ii) Ellis's repeated disavowals of her trial testimony over the span of fifteen years, despite certain flaws, indeed ring true on the critical retraction—which means that she did *not* in fact witness the shooting as she testified at Hyman's trial; and (iii) the state post-conviction court where Hyman first presented each of these serious issues denied any form of relief, including the request for a hearing.

Certain facts are firmly established in the trial record: shortly after 7:00 p.m., on March 10, 2000, a shootout erupted in the middle of Hassock Street in Far Rockaway, Queens, in front of the apartment complex at 1540 Hassock, known as the Redfern Houses. Ballistics established that more than thirty bullets were fired from at least four different weapons and in several directions, as bullet damage was found on several empty cars parked in the street, in the lobby and a second floor apartment in the 1540 building, and in the Friendly Market located across the street from 1540. Maria Medina, on tenant patrol duty inside the 1540 lobby at the time, was struck by one of the bullets, crawled toward and then was helped into the nearby elevator for safety, and died within minutes. The type of bullet that killed Medina remains unknown.[3]

---

[3] Responding officers found Maria Medina lying halfway inside the elevator, and the autopsy confirmed that the bullet that killed her perforated her liver, aorta and left kidney before exiting her body. Police recovered a deformed bullet, a single piece of lead (a bullet's material) and two or three pieces of deformed jacketing (a bullet's coating) from the lobby area, but no connection was made between these items and any of the recovered weapons or alleged shooting participants.

It is clear that these items were vouchered and "sent for further testing" (T. 1433) but it is not clear whether these items are specifically addressed in the later ballistics analysis testimony (discussed *infra* at Part II.A.4). This open thread, though factually noteworthy, is not material to the disposition of the petition: the prosecution did not at trial, and does not here, argue that there is any forensic connection between Hyman and the fatal bullet.

The shooting participants included two individuals standing along the fence in front of 1540—known to be codefendant Jonathan Whitmore and, mostly likely, Derek Harris, also known as Mark Antony, or Wiz—and two or more individuals in or near two cars double-parked in the middle of Hassock Street. Hyman admits that he was in the driver's seat of one of those double-parked cars, and it was the prosecution's theory at trial that the driver of the other car was the other codefendant, Osimba Rabsatt.

What has been extraordinarily difficult to resolve, however, is the single fact essential to the question of Hyman's guilt: Was he, as he has long claimed, the unarmed, intended victim of an ambush, or did he participate in the shooting?

Hyman did not testify at his trial. His version of events, however, was presented to the jury through the state's introduction of the several statements he made after his voluntary surrender, including written and oral statements to the police and his grand jury testimony. The only direct evidence against Hyman came from prosecution witness Shaquana Ellis, who testified that, from a third-floor window in 1540 Hassock Street, she saw Hyman's arm hanging outside the passenger window of a green Mazda, parked behind a red Acura, "fir[ing] off" gunshots. (T. 1551). Ellis said she saw "flashes" though not the guns, and despite the dark (it was after 7 p.m. in March), she also saw Hyman's face and hoodie, and was sure it was Hyman because she had known him since junior high. In her testimony, Ellis was specific in identifying her alleged vantage point (the window of a hallway on the third floor of 1540 Hassock) and the two individuals allegedly with her at the time (her friends Amanda Benitez and Shaquana

5

Delain). Of necessity, the state showcased Ellis's testimony during summation and, not surprisingly, the deliberating jury asked to have it read back.[4]

Sometime after the verdict, however, apparently later that year (2002), Ellis began telling certain individuals that she had not in fact seen the shooting. Despite several half-starts, Ellis has stood by the essence of her recantation through numerous interviews—with a private investigator, Hyman's post-conviction counsel, Hyman's current habeas counsel, and even the Executive Assistant District Attorney of Queens County Charles Testagrossa, who traveled to Ellis's home in Virginia for that purpose, as part of a limited inquiry triggered by the current petition.

Ellis's most recent iteration of her recant came in the form of sworn testimony before this Court during the hearing on Hyman's gateway innocence claim, a unique vehicle that takes the Court into largely uncharted waters. Under the Supreme Court's standards, adjudication of an actual innocence claim requires that the Court first assess the credibility of the Ellis recant and other testimony offered at the gateway hearing, and then assess how a rational jury faced with the overall record as now supplemented would likely vote: more probing and comprehensive than traditional sufficiency-of-the-evidence analysis, this process requires the Court to re-weigh the entire state's case anew and even reopen issues of *trial* credibility.[5]

Should Hyman prevail on this claim, he will have succeeded only in lifting the procedural bar that frees the Court to address the merits of his substantive claim that his trial attorney was ineffective for failing to introduce exculpatory evidence. Adjudication of that claim will likewise

---

[4] The state also offered four other witnesses who claim to have seen parts of the shooting, but, as discussed *infra* at Part II.A.2, the value of their testimony is questionable.

[5] Though drawn upon throughout Parts I and II (the overview and fact sections) of this opinion, the controlling actual innocence standards are fully set forth at the start of Part III.

entail an atypical jurisprudential expedition. Since the enactment of the Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), most ineffectiveness claims that, like Hyman's, have been rejected in the first instance by a state court are, as a practical matter, "doomed," Tavarez v. Larkin, 814 F.3d. 644, 647 (2d Cir. 2016). Even the most compelling ineffectiveness claims, therefore, will test the outer limits of AEDPA jurisprudence and this Court's authority to entertain the application.

It did not have to come to this.

First, the falsity of Ellis's trial testimony could and should have been exposed *at trial*, because the exculpatory evidence that Hyman's trial counsel withheld from the jury went directly to the question of her credibility. Kevin Hinkson, a private investigator retained by defense counsel Scott Brettschneider, conducted a sight line study revealing that it was physically impossible for Ellis to have seen what she claimed from the third floor hallway. Hinkson gave Brettschneider his findings along with supporting photographs and a videotape, but Brettschneider did not call him at trial. The proof is unrefuted that Brettschneider declined to call Hinkson because of a fee dispute rather for any reason that could be called "trial strategy."

Second, the state courts had a clear opportunity to right Ellis's wrong, as compounded by Brettschneider's, before recourse was sought in federal habeas. That occasion was Hyman's second post-conviction motion under N.Y.C.P.L. § 440 to vacate his conviction (the "Second 440"), where, in support of his new-evidence and ineffective-assistance claims, Hyman presented copious materials probative of the Ellis recant including: (i) an affidavit from a private investigator, Irwin Blye, who audiotaped an interview with Ellis during which she fully recanted; (ii) an affirmation from 440 counsel reporting that he had located Ellis in Virginia, and that in a series of four conversations she confirmed that she did not witness the gunfight but that she was

reluctant to sign an affidavit because she feared a perjury charge; (iii) a sworn affidavit from Stacey Manning, a friend of Ellis's to whom Ellis admitted that she did not witness the shooting; (iv) an affidavit from Kevin Hinkson, trial counsel's investigator, who reported that he interviewed Amanda Benitez and that she told him, contrary to Ellis's trial testimony, she was not in the third floor hallway with Ellis and did not see the shooting; and (v) a sworn affidavit from Benitez herself to the same effect.

On the ineffectiveness branch of the claim, Hinkson's materials, coupled with a separate affidavit from Hyman's father James Sanders, fully alerted the court to the disturbing probability that conflicting interests arising out of a dispute over payment of Hinkson's fee, rather than trial strategy, explain why Brettschneider did not introduce Hinkson's report.

The Second 440 court denied relief on both procedural grounds and on the merits in a decision that, as will be discussed, is ultimately unsustainable. The Ellis recant was still a developing story, to be sure, but the court denied even a hearing to explore the troubling matters raised in Hyman's motion papers that are at the heart of this federal proceeding. Now, in order to obtain relief from the Second 440 decision, Hyman argues, as he must, that on the merits of his ineffectiveness claim, the court unreasonably applied Strickland v. Washington, 466 U.S. 668 (1984) within the meaning of 28 U.S.C. § 2254(d), and that his "actual innocence" should excuse the bar erected by the state court's procedural rulings.

Fast-forwarding to the innocence hearing in this Court: Hyman subpoenaed not only Ellis but also Benitez and Delain (Ellis's other alleged companion at the window), and each made dramatic assertions—some believable, others not—about the night of the shooting and ensuing events. As discussed in detail throughout the body this opinion, the Court is convinced that, more likely than not, based on this new evidence, any rational juror would be unable to

credit Ellis's trial testimony; without question, therefore, any rational juror would likely have reasonable doubt about Hyman's guilt.  See House v. Bell, 547 U.S. 518, 538 (2006) (to prevail on an actual innocence claim, petitioner must show that "more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt" about his guilt).  To be sure, Ellis's testimony was not the state's only evidence, but the case against Hyman necessarily rises or falls with that testimony, so the loss of her credibility necessarily undermines the verdict.  See McQuiggin v. Perkins, 133 S. Ct. 1924, 1936 (2013) ("The gateway should open only when a petitioner presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial'") (quoting Schlup v. Delo, 513 U.S. 298, 316 (1995)); Rivas v. Fischer, 687 F.3d 514, 543 (2d Cir. 2012) (noting that "it may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict").

Unquestionably, the state had a difficult case to try.  Still, many of the assertions contributing to the verdict of guilt are tenuous at best.  For example, as will be discussed, two of the weapons known to have been used in the shooting were a .45 caliber and a 9 millimeter handgun.  Recovered shell casings established that these guns were fired from the street, where the cars were parked, and so it is one of these two guns that the prosecution insists, and that a jury had to believe, Hyman possessed and fired that night.  But both guns were found 19 days after the shooting inside the spare tire well of Whitmore's car—which had been parked in front of 1540 Hassock during the shooting and impounded by the police along with other bullet-damaged vehicles shortly after the scene was secured.  The prosecution offered no explanation,

but invited jurors to consider the implausible possibility that Hyman had somehow planted the weapons.[6]

House, of course, requires that the Court not fixate on Ellis or the guns recovered in Whitmore's car but instead take account of "*all* the evidence, old *and* new, incriminating *and* exculpatory," 547 U.S. at 537-38 (emphasis added) and this, as the length of the ensuing factual presentation attests, the Court has done. "All the evidence" includes the full trial record and all of Hyman's new evidence, including the hearing testimony, Hinkson's sight-line analysis and the other materials presented at the Second 440 stage and—despite the Court's lingering doubts that such materials belong in the analysis—even "old" materials that have been in the state's file since the trial and were "newly" offered, at the gateway hearing, as purported "rebuttal evidence of guilt." The conclusion remains inescapable: any rational factfinder exposed to the *entire* record as now constituted would have reasonable doubt about Hyman's guilt. See House, 547 U.S. at 538-39 ("the [actual innocence] inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record").

---

[6] Several officers testified to the prompt police response to the shooting: within twenty minutes there was a heavy police presence and the entire block was cordoned off. T. 787-88, 1413, 1421-22. It is also undisputed that Hyman sped off after the shooting. The notion that he returned within minutes to the heart of a secured crime scene to carry out this mission is preposterous.

In addition, as will be further discussed, the more closely one examines the record the more disturbing becomes the overall treatment of Whitmore in this case. Fast-forwarding to the gateway innocence hearing in this Court: as a sort of *pièce de résistance*, the state introduced as "rebuttal evidence of guilt" a 21-minute audiotaped statement by Whitmore purporting to incriminate Hyman. Though no doubt proffered as a sort of smoking gun, the gesture backfired. Whitmore is so palpably incredible on this tape that the state's reliance on it has the effect of bolstering the defense trial theory that a Whitmore bias may have infected the trial witnesses and even the investigation. Worse still, as also addressed further in the body of this opinion, in offering the statement at the hearing as "new" old evidence, the state concealed the fact that it *had* sought to introduce this statement at Hyman's trial.

Passing through the gateway, then, to the merits of the ineffectiveness claim, the Court further concludes, as discussed more fully below, that the state court's rejection of the claim is indefensible and, therefore, that the requirements of section 2254(d) have been met. Although AEDPA deference can at times look and feel like immunity it is nevertheless not absolute, and not a bar to relief on the unique and compelling facts presented here.

The petition for a writ of habeas corpus is granted. Respondent is ordered to release Hyman within ninety days "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry [him]." Pavel v. Hollins, 261 F.3d 210, 220, 229 (2d Cir. 2001) (reversing denial of habeas relief, holding petitioner was denied the effective assistance of counsel).[7]

## II. "ALL THE EVIDENCE, OLD AND NEW . . ."

### A. The Trial

#### 1. Openings

According to the prosecution's opening statement, Jonathan Whitmore, also known as Cigar, and Derek Harris, also known as Mark Antony, or Wiz, were standing along the fence bordering the 1540 property armed with loaded .380 caliber pistols when two vehicles, a red Acura, driven by codefendant Osimba Rabsatt, and a green Mazda MX6, driven by Hyman, "move[d] down Hassock Street in tandem," and "stopped in tandem" in front of 1540. (T. 713). Rabsatt, according to the prosecutor, exited the driver's side of the Acura and fired over the roof of the car toward Whitmore and Harris, while Hyman fired through the passenger window of the

---

[7] "The typical relief in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner." Herrera v. Collins, 506 U.S. 390, 403 (1993).

Mazda in the same direction, and Whitmore and Harris fired back toward the vehicles. Together, these four and others "decided then and there that night to have this gunfight," "to murder each other," and turned the surrounding area into a "killing zone . . . where anybody within the radius of where they were could foreseeably be killed or injured." (T. 713-714). (At the close of the evidence, as will be discussed, the trial court would rule that there was not an evidentiary basis for this "killing field" theory, and the state would pursue at closing solely the alternate theory that Hyman attempted to murder Whitmore, and that Whitmore fired back only in self-defense).

On the subject of the weapons found in Whitmore's car, the prosecutor argued, "Now, we're going to see how the guns that these two used, the 9 millimeter and the 45, wound up in Mr. Whitmore's car. And you are going to know and understand that perhaps somebody tried to throw a red herring [ ] the police's way." (T. 715).[8]

On behalf of Hyman, counsel Scott Brettschneider argued that jurors would have the "problem" of attempting "to reconcile this red herring" with the theory of the prosecution's case; emphasized Hyman's repeated assertions of his innocence throughout interrogations; suggested that each of the witnesses had a close affiliation with Whitmore and a thus motivation to bend the truth in his favor; and urged jurors to consider carefully "how many guns possibly were fired" and to conclude that there was "not enough" to be sure what happened on the night in question (suggesting, essentially, that the police "took shortcuts" by going no further after the initial round of arrests). (T. 717-719).

---

[8] In summation, the prosecutor rhetorically asked jurors, "Now, how did those guns get in that car. Well, more precisely, I submit to you the question is, how did the guns that were used in the attempted murder of Jonathan Whitmore wind up in his own car" (T. 2196-97).

### 2.     Eyewitnesses other than Ellis

In addition to Shaquana Ellis, four other individuals testified as eyewitnesses to a portion of the shooting that occurred on March 10, 2000 in front of 1540 Hassock Street: Margaret Contreras, Shereda Freeman, Lynn Burton, and Deborah McCoy.  None of the four identified Hyman as a shooter, but the prosecution's position at trial was that each nevertheless saw enough to "implicate" Hyman. (T. 2173).  Careful review of the testimony of each witness, however, strongly indicates otherwise.

### a.     Margaret Contreras and Shereda Freeman

Contreras and Freeman were both sitting on tenant patrol with Medina when they heard what sounded like firecrackers, first at a distance from the lobby then a second round much nearer.  Once they were sure it was gunfire, they ran to the elevator for cover.  Medina, however, "just stood there" and "wouldn't move," and then "threw herself on the floor to crawl toward the elevator" (T. 1037-38); Contreras realized Medina had been shot, "grabbed" her and "pull[ed] her into the elevator."  (T. 1037).  As for what she witnessed, Contreras testified that "at the time when [she] was pulling Maria in, someone opened the [lobby] door and [she] s[aw]—you know, some of the people coming into the building, but we were too busy pulling [Medina] in.  And [she] s[aw] cars but could only remember one."  (T. 1038).  She described the car as "dark greenish," and further testified that she "saw the window was down, and . . . saw something silverish from the window" that "looked like a gun but it was like a flash."  (T. 1038).  Shown a pair of photographs of the green Mazda that Hyman admitted he drove and parked in front of Redfern on the night of the shooting, Contreras said yes, that was the car she caught a glimpse of that night.

Whether Contreras genuinely saw what she claims is doubtful: on cross, Contreras confirmed that she was "trying to put everyone into the elevator" and "w[as]n't looking to see if [she] could see something." (T. 1049). She did not tell the first officer who interviewed her (Officer Robert Player) about the green car or the flash, and later spoke to Detective Keegan in her apartment and again did not say anything about seeing the car or a flash, and explained that she withheld the information because the officers "didn't ask [her] that exact question." (T. 1055, 1095-96).

Under cross-examination, Contreras admitted that she did not see the green car "as the shots were being fired." (T. 1056). She elaborated: "I said, when the door was open[ed], while we were pulling Maria into the elevator, when I looked to the side there is when I saw this car. It was very fast. I didn't stand there looking at the car. It was just a fast movement. It was green. It was fast. The door slammed and that was all I s[aw], but it was dark green." (T. 1056).

An additional problem with Contreras's credibility is that, for the two-year period between the shooting (March 10, 2000) and her trial testimony (March 2002), Contreras withheld from law enforcement the fact that she saw Whitmore carrying a gun as he ran into the lobby after Medina was shot. The testimony came in response to a specific cross-examination question, and was a surprise to all. (T. 1057).[9] The trial court told the prosecutor it was troubled

---

[9] One can only speculate whether defense counsel knew the answer in advance. The relevant colloquy is as follows:

Q. . . . when you say the door opened, are you saying the front door opened or the elevator—
A. The lobby. The lobby entrance door, yes.
Q. Okay. Who came in?
A. A gentleman.
Q. Which gentleman?
A. His name was Jonathan.
Q. Jonathan?

14

that none of "the paperwork" mentioned either the dark green car or the fact that Whitmore was carrying a gun. (T. 1065-67). The prosecution confirmed to the Court that the first time it knew that any of its witnesses saw Whitmore carrying a gun as he ran into the lobby was just then, when Contreras testified. (T. 1063). The prosecutor further admitted that he did not know until a month before trial that Contreras was going to testify that she saw a flash and a green vehicle driving away. (T. 1069).

Defense counsel persisted, asking, "you never told the tens of police officers who came and interviewed you that you saw Jonathan Whitmore with a gun?" Contreras replied, "No." (T. 1080 et seq.). She confirmed that this moment in the trial was the first time she told anyone, and stated that if she had not been specifically asked that question by the prosecutor or defense counsel, she would have continued to keep the fact secret. (T. 1080). Contreras also confirmed that Whitmore eventually took refuge in her apartment, and said he was sorry for what happened. (T. 1084).[10]

---

A. Yes.
Q. Okay. And by the way, when the district attorney was asking questions did you mention that Jonathan was in the lobby at any point in time?
A. No, he didn't ask me who came in.
Q. Okay. Did you see Jonathan with a gun?
A. Yes.
Q. Did you tell the police this?
A. No. I told [them] that he came to my house.
Q. That he came to your home?
A. Uh-huh.
Q. When was the first time that you let anybody know that you saw Jonathan come in with a gun?
A. I didn't tell anybody that. (T. 1057-1058).

[10] During its summation, the prosecution pointed to this moment in the trial to refute the defense claim that a pro-Whitmore bias infected the witnesses and their accounts, emphasizing that it was a one of the allegedly biased witnesses who placed a gun in Whitmore's hand. But this argument overlooks the obvious Whitmore bias evident in the fact that Contreras withheld the information for two years and would not have volunteered it if it were not the subject of a specific question.

Turning to Shereda Freeman, her testimony does not extend beyond a general description of the sounds of the shooting and the ensuing efforts to get Medina into the elevator after she was shot. Freeman did not see the vehicles outside, but did see Whitmore running into the building as she helped Contreras pull Medina into the elevator; she said it looked like "[h]e was trying to, you know, get to safety, get to cover." (T. 1666).

In sum, neither Contreras nor Freeman offers evidence of Hyman's guilt.

### b. Lynn Burton

Lynn Burton was also a 1540 resident and member of tenant patrol. When the shooting began, Burton was in her apartment (3C), sitting in a chair by one of the windows that faced Hassock Street. (T. 1593). Burton's account differs from Ellis's in that Burton said she saw *three*, not two, cars double-parked in front of the Friendly Market across the street: "a green jeep, a red color car with dark tinted windows" and "behind that. . . a dark colored car." (T. 1594). She saw "shots being fired from two vehicles . . . from the red vehicle and the dark colored vehicle that was behind the red vehicle." (T. 1594). She was not able to see who was firing. (T. 1595). Shown the photographs of Hyman's green Mazda, Burton stated that she recognized the vehicle as the "dark color[ed]" car; she also repeated that she "saw shots come out of that car" but could not say how many. (T. 1596). Burton added that, "with the red car it seems like the shots were a little different from . . . the green car," and that she was "not familiar with guns…and all [she] s[aw] was some fire coming out of a window." (T. 1628). Burton was sure that there was no one standing outside the vehicles, and that she did not see Jonathan Whitmore that night; she knows him well because his mother lives in the building. (T.1608-09, 1612).

In sum, Burton does not identify Hyman as a shooter; although she testified that she saw shots being fired from a dark, or green vehicle, the value of her account is diminished by the

degree to which it differs from the detailed account offered by Ellis, which served as the centerpiece of the prosecution's case. Unlike Ellis in two respects, Burton (i) placed a third vehicle in the mix, and (ii) did not see anyone leaning out of the green car shooting with both hands. (T. 1612).

          **c.**        **Deborah McCoy**

Deborah McCoy lived in an apartment on the seventh floor of 1460 Beach Channel Drive, directly across from 1540 Hassock Street. She was at home playing cards with friends when she heard gunshots, ran to her kitchen window and saw in the street a black car parked behind a red car.

The value of McCoy's account is questionable because of the degree to which it conflicts with key features of Ellis's account. Notably, McCoy testified that whoever was in the dark car *exited* the vehicle and then fired his weapon. See T. 1784-85 ("the guy in the black car," whom she did not know and did not identify as Hyman, "got out and shot" and then "got back in"). Pressed, McCoy confirmed that she saw the driver of the black car exit his vehicle, and that he was "[s]tanding in the street" while holding a gun. (T. 1824). McCoy also said that, yes, she did see Whitmore, whom she knew well (his sister is her goddaughter and his mother is her son's godmother), running along the walkway in front of 1540 Hassock shooting at Rabsatt and at the man firing from the black car. She also saw a man she knew as "Mark" or "Wiz"[11] trying to get inside 1540 Hassock Street while shooting at the cars in the street. McCoy told the jury that she initially told the police that "all the shot first came from the cars, and at that point in time to defend themselves, Jonathan Whitmore and Mark Antony shot back at the people in the cars."

---

[11] The reference is to Mark Antony, also known as Derek Harris, the individual the prosecution said in its opening was standing with Whitmore along the fence in front of 1540.

(T. 1813-15). McCoy also placed one of the calls to 911; none of these details are mentioned in that call. [12]

Additionally, it is clear that the jury did *not* credit McCoy in one important respect: she offered the only direct evidence connecting codefendant Osimba Rabsatt to the shooting—she testified that she saw Rabsatt, whom she knew well from school, shooting from the driver's side of the red car, over the vehicle's roof, towards the "guys trying to run into the building" (T. 1784)—but Rabsatt offered two alibi witnesses and was acquitted on all counts.

### 3. Shaquana Ellis's Trial Testimony

As Ellis was about to take the stand, Brettschneider advised the court that he noticed two people he did not recognize enter the courtroom, and asked whether they were employees of the District Attorney's office. The prosecutor told the court that Ellis had told him that "her life had been threatened on a number of occasions not only by [Hyman] directly but [Hyman's] girl," and that someone told Ellis that "when she leaves [the] courtroom . . . [Hyman's] brother is going to kill her." (T. 1540). Therefore, the prosecutor continued, his office "took steps to make sure that somebody was with her to make her feel secure," since she "was here to identify [Hyman] and he knows that." (T. 1540-41).

### a. Direct Examination

Turning to the night of the shooting, Ellis was specific about where she was, and who was with her, at the time she allegedly saw the shooting:

---

[12] McCoy also testified that her friend Tanya Samuels was with her at the time and also looking out the window. Samuels did not testify; apparently McCoy did not tell investigators about Samuels but mentioned her for the first time during her trial testimony. (T. 1806, 1823-24, 1858-1860).

> Q. And where were you?
> A. I was in the hallway
> Q. Which hallway, which floor?
> A. Third floor
> Q. And. . . who you were with?
> A. With two of my friends
> Q. …Who were your friends, please?
> A. Amanda and Shaquana
> Q. Same name as you, Shaquana?
> A. Uh-huh.
> Q. What's her last name?
> A. Delain? (T. 1545).

Ellis reiterated this testimony on cross examination. See T. 1569 ("And [Delain] was standing right where you were with standing . . .? Yes."); T. 1573 ("Was Amanda Benitez with you that night? Yes, she was.").

According to Ellis, the three young women were "[j]ust talking," though Ellis and Benitez (she does not include Delain) were also "looking out the window." Ellis, with Benitez watching along with her, then saw "two cars pull up," a red Acura and a green two-door car. (T. 1547-49). "The red Acura was first, and then th[e] green car was behind it." (T. 1554). The trial court asked Ellis about her vantage point:

> Q. Which window were you looking out of?
> A. I was looking out - - well, I can't really ex - - the front window that's facing the store?
> Q. Yes, what street does that face?
> A. I think Hassock Street, I guess.
> Q. And what store does that face?
> A. Friendly's market. (T. 1547-48).

Ellis said she was familiar with the red car because she had seen Hyman driving it before, and she knew him since junior high school (she was 17 or 18 years of age at the time of the trial). (T. 1549). She then testified as follows:

> Q. What if anything happened after the cars came around Hassock Street?

> A. They sat there for about a while.[13]  Then the windows—while the
> green window was down, and I just s[aw] Tullie.  I s[aw] a car.  Then I
> s[aw] Tullie hanging out the - - from the window, from the passenger
> side, and just fired off.
> Q. When you say fired off, what do you mean?
> A. Gunshots.
> Q. What if anything did you see at the red car?
> A. I couldn't see.
> Q. Were you able to see the car?
> A. I s[aw] the car but I wasn't sure who was in the car. I couldn't see who
> was in the car.
> Q. Why not?
> A. The windows are tinted.
> Q. Now, just tell the jury how far away from the green car you were, if
> you can tell us?
> A. I can't.  I can't - -  really can't say. (T. 1550-51).[14]

Ellis further testified that it "was dark" but, "[with] [t]he street light you can see because

when he was hanging out - - I know him so I could really see his face."  (T. 1551).   Asked,

"what was he doing that you could see his face?" Ellis replied, "[h]e was shooting." (T. 1551).

She was then asked to show the jury "what he was doing."  Her transcribed reply is: "He was

hanging out from [sic] like this just shooting out, but he was hanging out with a hoody on just

shooting out." (T. 1552). At the prosecution's request, with the aid of photographs of 1540

Hassock Street and an enlarged map of the scene, Ellis indicated to the jury where she was and

the approximate location of the green car.  (T. 1555-60).

---

[13] On cross, Ellis clarified that by "a while" she meant "[n]o longer than a minute." (T.
1566).

[14] Under cross-examination by codefendant Rabsatt's counsel, Ellis confirmed her
testimony concerning the red car:

> Q. From where you were standing in the hallway you were able to see the
> red car, correct?
> A. Yes.
> Q. You see anybody get out of that red car?
> A. No.
> Q. You see anybody firing shots from the vicinity of the red car?
> A. No. (T. 1578).

The following ensued:

> Q. How long were you watching this?
> A. About a minute. Not - - I'm not - - I'm not quite - - I'm not sure.
> Q. That's okay. You said he was shooting. How many shots did you hear or see?
> A. I heard a lot and I went back in the house?
> Q. Did you see gun*s* in his hand?
> A. No, I s[aw] fire come out. I s[aw], was it [sic] fire, like red come out of the gun. Bullets.
> . . .
> Q. Did you see anybody else on the street firing a gun that night?
> A. No.
> Q. Okay.
> A. I didn't stay in the hallway long enough to see him or see anybody else shooting or - - (T. 1552-53) (emphasis added).

Notably, the use of the plural "gun*s*" in the third question of the above-quoted excerpt is entirely the prosecutor's, and not based on anything Ellis had yet said. Not only was no objection recorded, but the plural ultimately became Ellis's testimony. First, Brettschneider himself incorporated the plural into one of his questions:

> Q. Okay. So the front portion including his head was sticking outside the car; is that correct?
> A. Yes.
> Q. And both hands - - you saw both hands firing guns, is that correct?
> A. Yes. (T. 1569).

Counsel for co-defendant Rabsatt then revived the subject during his cross-examination, with the apparent objective of trying to further exculpate his client by placing *both* of the weapons believed to have been fired from the street in Hyman's hands:

> Q. Approximately how many flashes of lights of gunshot did you see coming from where you said Tully Hyman was?
> A. I say about four or five. Five, six. I'm not really sure how many. It was about five.
> Q. You said you saw him fire with both hands?
> A. Yes.
> Q. Indicating two separate weapons? (T. 1579).

Brettschneider objected, the court sustained the objection, and then asked Ellis, "Did you

see any guns at all at that time?" She replied: "I didn't see guns, but I s[aw] fire coming from his

hands so --" and the court interrupted, asking, "From one hand or both hands?" and Ellis replied,

"I'm not sure was it both or not." (T. 1579).

Counsel for Rabsatt resumed:

> Q. Well, whenever you were indicating you were indicating both hands.
> Is that what you saw?
> A. Yes.
> Q. You saw flashes of light from both hands in the way that you've been
> describing?
> A. I don't remember.
> Q. But you saw both hands moving?
> A. Yes, I - - yeah.
> Q. Were you able to see the hands or were you able to see the flashes of
> light?
> A. Flashes of light.
> Q. And you saw flashes of light indicating both hands were moving?
> A. I really don't remember. (T. 1579-80).

### b. Cross-Examination

In response to two separate Brettschneider questions, Ellis admitted that when initially

questioned, she told the police that she did not see any part of the shooting. (T. 1572, 1576).[15]

Brettschneider's ensuing line of inquiry addressed the possibility that Ellis lied to protect

Whitmore because of her relationship to him. Although counsel did not succeed in eliciting

---

[15] The following exchanges occurred:

"Q. But it's a fact you told the police you didn't see [any]thing on the night of March 10,
2000, is that correct?
A. Yes." (T. 1572).

"Q. And then when the cops did come that night you told them that you didn't see
[any]thing?
A. Yes." (T. 1576).

anything approaching a full admission regarding bias or fabrication, counsel did elicit some facts strongly suggestive of both bias due to Ellis's relationship with Whitmore, and of Whitmore influence on her testimony.

For example, Brettschneider asked Ellis whether "it was only after Jonathan Whitmore was arrested" that she "c[a]me forward to the police and indicate[ed] that [she] saw Tullie Hyman shooting at people," and she said "no," insisting that she did not learn until the following morning, when she was at the precinct, that Whitmore had been arrested. (T. 1570). This was so, she maintained in response to Brettschneider's question, even though she was, according to her principal testimony, physically in the 1540 building during the shooting and immediate aftermath. (T. 1570-71). Returning to the fact that she claimed to be on the third floor, and that Whitmore was on the fourth, counsel pressed: "Are you telling us you were not aware that a floor above you where you said that you were standing [that] . . . the police were trying to get Jonathan Whitmore to surrender . . . ," but Ellis was adamant that she "did not know Jonathan Whitmore was arrested until the next day, until [she] got to the precinct." (T. 1571).

Ellis did admit that she had received "a letter or two" from Whitmore while he was in prison and that he was the father of her cousin's child, and when offering their ages, she referred to Whitmore familiarly as "Jon" rather than Jonathan. (T. 1563-64) ("John's daughter is four and [Ellis's cousin] is about 25.").

During the separate cross-examination by Rasbatt's attorney, Ellis said that in addition to Whitmore's usual nickname, Cigar, she also called him Buff. (T. 1582). She acknowledged that he was a member of "the dog pound crew," and that the letters "DP" were "all over the building" as well as on a tattoo worn by "Wiz." (T. 1584). She further acknowledged that she often saw Whitmore, Mickey and Wiz hanging out in front of 1540, but not on the night of the shooting,

and that Wiz and Mickey had access to Whitmore's Ford Taurus, which all three shared. (T. 1585-87).[16]

In response to Brettschneider's question, Ellis denied that Whitmore had paid her to go to the police precinct after the shooting or to incriminate Hyman, and then volunteered that, "[she] didn't see Jonathan." (T. 1565). Counsel pressed:

> Q. You didn't see Jonathan?
> A. No, I did not.
>  . . .
> Q. Did you see Jonathan Whitmore that night?
> A. I did not see Jonathan. I told you that before.
> Q. You didn't see Jonathan Whitmore that night?
> A. No, I didn't.
> Q. You didn't see Jonathan Whitmore running with a gun?
> A. No, I did not. I told you I didn't stay in the hallway long enough to see anything else. (T. 1565).

Asked about it another way, Ellis said, no, she did not see who Hyman was shooting at. (T. 1566).

Counsel challenged Ellis's credibility on this specific claim in yet another exchange later in the examination:

> Q. Did you see the cars drive away?
> A. No, I did not.
> Q. Did you call the police?
> A. No, I did not.
> …
> Q. Did you ever know that somebody was shot that night?
> A. I didn't know 'til the cops and everybody else had c[o]me.
> …

---

[16] In summation, the prosecutor argued that "[t]here is no evidence . . . that at any time" the two guns found in Whitmore's car "were . . . in Jonathan Whitmore's possession," and that "[o]f course" Whitmore did not put them there because he ran into the building and was "hold up" in his mother's apartment, and then arrested. (T. 2197). But this nugget of testimony from Ellis—that Harris and others used and had access to Whitmore's car—may be the important overlooked clue: *i.e.*, it may well have been the work of the elusive Derek Harris, also known as "Wiz," whom the prosecution's own narrative identifies as the operator of the other .380 fired from the fence area.

Q. And it's your testimony that you never spoke to Jonathan Whitmore that night?
A. No.
Q. Speak to his mother?
A. No.
Q. Speak to anyone on his behalf?
A. No, I did not. (T. 1576).

Finally, Brettschneider confronted Ellis directly with the *possibility* that he may have

proof that she told others that she did not actually see the shooting:

Q. Did you ever tell Amanda Benitez to go to the police and to lie and to tell them that she was there with you and that you saw Tullie Hyman shoot out of a green car?
A. No.
Q. Well, did you ever tell a private investigator by the name of Kevin Hinkson that you didn't see anything?
A. I don't know which cop or detective it was, but I recall telling some of that.
Q. You do recall telling some of that?
A. That night it happened, yes.
Q. No, after that?
A. No.
Q. You never told a private investigator that you didn't see Tullie Hyman that night, and you were with Amanda Benitez at that time and that Amanda Benitez told the private investigator with you that you both did not witness this?
A. No, I did not. (T. 1572-73).[17]

---

[17] These questions are obviously based on Hinkson's work product and corroborate, in part, Hinkson's claim about what he furnished to Brettschneider. The first question, whether Ellis told Benitez to tell the police she was with Ellis when she saw the shooting essentially tracks what Hinkson reports that Benitez told him and that appears in the unsigned Benitez affidavit that Hinkson says he gave Brettschneider. Benitez ultimately signed her affidavit on March 21, 2002; Ellis testified on February 28, 2002, so although Hinkson does not mention dates, it is reasonable to infer that the unsigned Benitez affidavit, or a forecast of its contents, was in Brettschneider's possession when he cross-examined Ellis.

As for the question whether she ever told a private investigator named Hinkson that she did not see anything, Brettschneider is in error: Ellis did not recant to Hinkson. The investigator to whom Ellis recanted was Inspector Blye, who was not yet in the picture.

### 4. Police Witnesses

#### a. Ballistics

There was a considerable body of testimony concerning the recovery and interpretation of ballistics evidence. <u>See</u> <u>generally</u> T. 1166-1286 (Detective Noya); T. 1309-22 (Detective Hensen); T. 1405-1434 (Officer Player); T. 1435-1473 (Detective DiTommaso); T. 1475-1526 (Detective Tamburri); T. 1895-1927 (Sergeant Chadwick); T. 1930-59, 1984-94 (Detective Cashen). None directly implicated Hyman.

Nevertheless, the prosecution relied heavily on inferences that could be drawn from the ballistics to advance its theory for what occurred on the night of March 10, 2000.

The evidence established that officers responded promptly to the scene of the shooting and had the area secured within twenty minutes. Thereafter, they recovered a substantial volume of ballistics evidence, consisting of: discharged shell casings (the location of which corresponds, roughly, to where a weapon was fired); actual weapons; and fired bullets or their remnants (consisting, as noted earlier, either of fragments of bullet material (lead) or bullet coating (copper or brass jacketing)).

More specifically, police recovered the following discharged casings: four .45 caliber shells, twelve .380 shells, and fourteen 9mm shells. The .45 caliber and 9mm shells were concentrated in the middle of the roadway, where the prosecution placed the red and green vehicles, while the .380 shells were in front of the building along the fence and on the walkway, which corresponded, according to the prosecution, to the movements of Whitmore and/or Harris.

As for weapons, Detective Noya found a .380 handgun, wrapped in green towel partially inside a box, lying on the lawn in the rear of 1540 Hassock Street; Noya described the weapon as "falling out of the box" as if it "had been thrown out of a window." (T. 1255). There is no

dispute that this .380 belonged to and was fired by Jonathan Whitmore.[18]  Two other recovered

weapons were also linked to Whitmore:  nineteen days after the shooting, an Intratech 9mm

semiautomatic handgun with two magazines (or ten rounds) of ammunition and a .45 caliber

handgun were found inside the spare wheel well of Whitmore's Ford Taurus, which had been in

police custody since the night of the shooting.[19]  No testing connected either of these weapons in

any way to Hyman.

Analysis of the recovered materials established the following:  six of the twelve .380

shell casings recovered from the fence and sidewalk areas were fired by the .380 handgun

belonging to Whitmore and found outside his mother's apartment; all fourteen of the 9mm shell

casings recovered from the street were fired by the 9mm gun found in the trunk of Whitmore's

car; and all four of the .45 caliber shell casings recovered from the street were fired by the .45

caliber gun found in the trunk of Whitmore's car.  The only unaccounted for shell casings are the

remaining six .380's.  Although the state understood but did not emphasize that there may have

---

[18] Detective Brian Quinn, responding to a tip that there might be a shooting victim in apartment 4C (Whitmore's mother's home) entered that unit and found Whitmore there.  He also noticed, outside the window of the rear bedroom, a small black bag, and inside the bag discovered a box containing a .380 handgun. (T. 1680-87). The bag was near but not directly underneath the window of apartment 4C; Quinn agreed, however, that it was "conceivable" that the bag "could have" been tossed from the window of 4C.  (T. 1946-48; T.1697-98).  It appears that this .380 that Quinn spotted outside Whitmore's window was the same .380 that Noya later documented on the lawn in the rear of the building.  Further, as discussed *infra*, in the audiotaped statement of Jonathan Whitmore—which the state sought unsuccessfully to admit at trial but which was offered as rebuttal evidence at the gateway hearing—Whitmore admits this was his weapon, that he fired it repeatedly during the shooting that gave rise to the indictment, and that after ran into his mother's apartment, he tossed it through her window into the courtyard.

[19] The Taurus was impounded because, along with several other vehicles parked in front of 1540 Hassock Street, it suffered bullet damage during the shooting.  The discovery of the guns was made by a property clerk performing a vouchering inventory before sending the vehicle off to the pound.  The police did not learn that the Taurus belonged to Whitmore until the day after the shooting, when the police ran the plates of all the impounded cars.

been more than four shooters,[20] the unrecovered weapon that would be the source of these casings is not relevant here, for the state took the unequivocal position at trial that the bullets that killed Maria Medina came from one of the two guns fired *toward* the 1540 building *from* the vehicles double-parked in the street, *viz.*, either the .45 caliber or the 9mm. (T. 2170-2199).[21]  As noted, (a) there was no evidence connecting either of these weapons to Hyman, and (b) only the preposterous suggestion that Hyman planted the weapons was offered to distance the guns from Whitmore.

Finally, to establish the scope and scale of the shooting activity, the prosecution elicited testimony as to the many locations where bullet damage was observed.  In addition to penetrating the 1540 Hassock Street lobby (and killing Medina), bullets also caused damaged in apartment 2C on the second floor of 1540 Hassock and the Friendly Market across the street.

---

[20] For example, in its opening, the prosecution stated that "[t]here were four people—more, but [we] have identified four" that were involved in the shooting. (T. 712).  Certain details in the witness accounts arguably take on significance in this light.  For example, the red Acura is consistently described as having dark-tinted windows that made it difficult to see how many people were in that car; Lynn Burton says shots were fired from "both cars" but also places a third car (a green jeep) in the mix; and Whitmore, in the audiotaped statement not admitted at trial but offered at the gateway hearing in this Court, says there were "[t]wo people, guaranteed" in both the red and the green car.

[21] The fact that a second .380 had to have been used, but was not recovered, is only one of the loose threads in the ballistics.  For example, although all fourteen of the recovered 9 mm shell casings are attributable to the 9mm gun found in Whitmore's car, a damaged 9mm gun showing evidence of discharge was also recovered from the trash compactor.  (T. 1233-35).

Another open thread is the apparent failure to test the fired-bullet remnants (*i.e.*, the lead and copperjacketing) recovered in the lobby, which might have established specifically which type of bullet killed Medina.  Detective Noya recovered one deformed lead bullet, three pieces of deformed copperjacketing, and one piece of deformed lead (labeled N35, N36 and N37) from inside the lobby (T. 1230), and Police Officer Player, who vouchered Noya's ballistics evidence, testified that the "pieces of copperjackets, [and] one piece of defaced lead" (labeled N35-37) were included along with the other evidence (labeled N1-34) (T. 1416), but these items appear to be absent from the report discussed by Detective Tamburri, which addressed all the other recovered ballistics. (T. 1504-1506).

Fast-forwarding to the gateway hearing in this Court, the prosecution made the following concessions concerning the ballistics evidence:

Court:  Can we agree among us that there's no ballistic evidence that ties [Hyman] into this particular crime?

A.      I would agree . . . I don't believe that the ballistics evidence is probative as to—

Court:  [Hyman's] guilt.

A.      As to [his] participation. . .

Court:  When I say ballistics evidence, I mean lab testimony.  I don't mean where shell casings were recovered and so forth.

A.      I don't recall any lab testimony that would actually be probative as to [ ] who [was] involved in this incident.

Court:  Do you agree with that?

A.      Certainly not Mr. Hyman, at any rate. (H2 at 45-46).

### b.      Hyman's Statements; Recovery of the Mazda and the Acura

The content of Hyman's statements came in through Detectives Richard McCabe and Herbert Shedrick.  Detective McCabe testified that he interviewed Mr. Hyman at the 113th Police Precinct on Saturday, March 11, 2000, the day after the shooting, following Hyman's voluntary surrender.  After a Miranda reading and waiver, Hyman told McCabe, in essence, that he was the victim of a shooting.  (T. 1382-89).  Hyman wrote out his statement, signed it, and McCabe read it into the record:

On Friday [March 10, 2000] when I came home from court Shakina called me and we were going to meet later 8:00 or 9:00.  I would pick her up at her building, the last one.  I drove down the street, the one way and pulled up behind a white civic. I put [on] my hazard indicators, took the car out of gear, put it in neutral and pulled the emergency brake up.

> I looked over by the stores and the building.  No one was there.  Dark station wagon was backing across from me.[22]  Then I heard three or four shots.[23]  I looked in my door mirror[24] and saw two guys coming up behind me from the sidewalk firing.  I got low in the car.  I tried to put the car in gear but it stalled out.

> I got it back on.  I saw two guys get out of the wagon and they were firing in my angle.  I got the car in reverse and went around the civic.  Made a left at the light and went to my brother's house and told him what happened.  Grabbed some clothes.  Called my girlfriend and left. (T. 1388-89).[25]

As answers to specific questions, Hyman told McCabe that he had been going out with Shakina for five months; that she did not live at Redfern but "hangs out" there; that Hyman was alone in his car; that he had been receiving crank calls for two weeks; and that "if [he] had [his] pick," he would say that they were from "[t]he people from Redfern." (T. 1389).

The following day—Sunday, March 12, 2000—Hyman was transferred from the 113th to the 101st precinct, where he was placed in a cell in the detective squad room.  He specifically asked to speak with Detective Herbert Shedrick apparently because, like Hyman, he was African-American.  (T. 989).  Hyman told Shedrick that on March 10, 2000, at approximately 7:00 p.m., he drove to 1540 Hassock Street in a red Acura to pick up a girl that he had been seeing for five months and that, after double-parking his vehicle in front of the building, he saw two men coming out of a car parked behind him.  (T. 858-68).  Hyman further told Shedrick that

---

[22] The written statement was also admitted.  In that document, Hyman wrote that the dark station wagon was "back in across from me."

[23] Hyman's written statement states that he "heard 3 or 4 shots from the back."

[24] In the written statement, Hyman first wrote "rear mirror" and then crossed out the word "rear" and wrote "left."  The change is initialed by McCabe.

[25] Fast forwarding to the gateway hearing in this Court, the lead detective on the case testified that Hyman's girlfriend Shakina was interviewed, and that, in "[s]um and substance she said that she was going out with Tullie for a while, they were having their problems and they were supposed to meet that night." (H3. 47-48).

the two men started shooting at him and, as he tried to start his car to get away, other people started shooting at him from the side of his car, and he managed to flee. (T. 868).

According to Shedrick, approximately two hours later, Hyman spoke with him again, and during this second conversation, stated that he had in fact been driving a green Mazda that he "just recently bought," and not a red Acura. (T. 870). According to Shedrick, Hyman also told him where he had parked the car, and when Shedrick and Cashen went to that location (the garage of Hyman's aunt's house, approximately 20 minutes away), the vehicle was there. (T. 935-37). Shedrick noticed that the passenger-side car window was broken; both Cashen and Shedrick noticed bullet holes on the front and side of the car. (T. 985, 1955-56).[26]

On March 14, 2000, Detective Noya examined the green Mazda and found two bullet impact marks on the front hood, two bullet holes on the passenger-side door, a bullet hole on the

---

[26] The particulars and sequence of events involving the change of this feature of Hyman's statement—from the red Acura to the green Mazda—are not entirely clear. The problem appears to stem from the fact that Shedrick had retired a year before Hyman's trial, and the notebook in which he took notes of his interviews with Hyman was lost. At trial, Shedrick was permitted to consult a Xerox of pages torn from the notebook over the defense's authenticity, completeness and Rosario objections.

As for the particulars, Shedrick testified that between his first and second conversation with Hyman, Hyman had phoned his mother in the Carolinas, and that was why Hyman eventually told him about the green Mazda. But sometime earlier that day, while in the 113th precinct but before his conversation with Shedrick, Hyman apparently spoke with Detective Cashen about the green Mazda, and according to Shedrick's hearing testimony, it was a fellow colleague and not Hyman who told Shedrick about the green Mazda. (T. 945-1001). According to a DD-5 prepared by Detective Cashen and introduced by the prosecution at the gateway hearing (R-EXH G47), sometime on March 12, 2000 Cashen was already making inquiries in the DMV computer about the green Mazda, Hyman overheard, and got upset. When Brian Dandy's name was mentioned as the original owner of the car, Hyman told Cashen that Dandy had nothing to do with the car. Also known as Bezo, Dandy was Hyman's friend and the Mazda's original owner, but he sold the car to another individual who in turn sold it to Hyman, who was making the payments. Hyman then asked, in substance, if the police would be satisfied that he was the owner if he was to tell them where the car was, Cashen said yes, and Hyman then disclosed that the car was in his aunt's garage, where he parked it after he was fired upon on Hassock Street.

right rear bumper, and a possible bullet hole in the flat, right front tire (T. 1240).[27]  He recovered two deformed lead bullets from the passenger-side door; a deformed jacketing from the rear right fender, and a deformed lead bullet from inside the right front tire (T. 1241-42).

As for the red Acura, Detective Brian Henson testified that, in response to an anonymous telephone call received at the precinct, he went to the vicinity of Beach 60th Street, where he found the parked vehicle; it showed no signs of bullet damage.[28] (T. 1300-1303, 1337-38).

**5.    Hyman's Grand Jury Testimony**

The prosecution also admitted Hyman's grand jury testimony, which spans eleven pages of the trial transcript.  (T. 1725-1736).  The narrative reads essentially the same as the statements Hyman gave to McCabe and Shedrick:  while waiting for his girlfriend, he "heard multiple shots coming from the back of the car," then "scrunched down," saw two other men firing at him, eventually switched on the car, put it in reverse to go around a white civic, and fled.  In response to specific questions, Hyman testified that he was driving a green Mazda MX6, a vehicle registered in someone else's name but for which he was making the payments.  He was familiar with the red Acura, which belonged either to his mother or to his brother and which he used to drive before he bought the Mazda.

Hyman further testified that he was unarmed, and that the Acura was not at the scene at all that night.  He also reiterated that he did not know Jonathan Whitmore, did not threaten him, and did not recognize him as having been at the scene of the shooting.  Finally, when pressed on

---

[27] Noya initially stated, twice, that there were two bullet holes on "the right driver's door" and then corrected himself, "Oh. If I said driver, I'm sorry. Yes, right passenger side door."  (T. 1240).

[28] The prosecution also introduced photographs of the crime scene, the green Mazda and red Acura, and a large crime scene diagram used throughout the trial to demonstrate the location of the recovered ballistics evidence and events to which the witnesses testified.

his earlier suggestion that his girlfriend Shakina might have set him up, he backpedaled somewhat but did not abandon the idea altogether.

### 6.    The 911 calls

Nine calls to the 911 operator were introduced.[29]  Callers 1, 2, 3, 4 and 7 describe generally the fact that a shooting occurred and that a woman had been shot. (Caller 2 remarks that "a lady has been shot," and "I don't know who did it"; Caller 3 reports that "there was a whole bunch of gun fire," and Caller 4 notes that "they were shooting into the building").

Caller 5 reports that "there was a man with a gun in front of the building."  Caller 6 states: "if the police were smart they should look at apartment 4B and 6D . . . Jonathan, I don't know the other guy."  Caller 8-9 (the same individual calling back after a dropped call) states: "I'm just calling to let you know the shooter . . . still in the building. . . apartment 4C and 6C . . . his name is Jonathan. . . his mother live in the building . . . the other one is in the building . . . I don't know his name . . . he's black, dark skink kind of chubby, about 5'6" . . ."  In his second call he states: "Jonathan, that's the guy who did the shooting . . . his mother lives there . . . he ran in the building . . . and he drives a station wagon parked at the crime scene right by the telephone pole."

### 7.    Defense Case

Hyman did not put on a defense.   Rabsatt called his brother and another witness who both testified that Rabsatt was with them, and not at 1540 Hassock Street, at the time of the shooting, and in summation attacked the credibility of Deborah McCoy, the only witness who

---

[29] The Court was furnished with a CD containing the recording of these calls but not a transcript.  The description and partial transcriptions here are the Court's.

placed him at the scene.[30]

### 8. The Jury Charge on Accessorial Liability

As will be discussed, the Schlup standard considers what "reasonable, properly instructed jurors would do." House, 547 U.S. at 538 (internal quotation and citation omitted). The parties do not dispute the correctness or application of the trial court's principal instruction on depraved indifference murder;[31] the only issue warranting attention is the scope of accessorial liability.

As late as the charging conference the prosecution was still pursuing alternative theories: *i.e.,* both that Hyman came to Hassock Street with the intention of killing Whitmore, who fired back in self-defense, and that all shooting participants were liable for Medina's murder on the "pre-arrangement" acting-in-concert theory recognized in People v. Russell, 91 N.Y.2d 280 (1998). Under Russell, a defendant can be convicted of depraved indifference murder on an accessorial liability theory where there is no proof as to who fired the stray bullet that killed an innocent bystander, but only if there is some proof of pre-arrangement, or tacit agreement to engage in the gun battle that placed the life of an innocent bystander at risk. Apparently

---

[30] Rabsatt briefly appears in the testimony of Detective Cashen. Cashen first spoke with Rabsatt approximately 48 hours after the shooting, when Rabsatt and his mother and uncle came to the police precinct after being questioned earlier at their home. (T. 2018-20). Rabsatt was not arrested until sometime later, after Cashen spoke with McCoy, who told him that she saw Rabsatt firing a weapon. (T. 2041). Cashen also testified that when he first spoke to Rabsatt, he had a basis for believing that Rabsatt knew Hyman (T. 2022-23); objections to questions addressing the source of his knowledge were sustained, although Cashen was permitted to state the following: "The information. Known associate." (T. 2022).

[31] On the second degree murder count, the court instructed, principally, that "a person [is] guilty of murder in the second degree when under circumstances evincing a depraved indifference to human life he recklessly engaged in conduct which creates a grave risk of death to another person, and thereby causes the death of that person or a third person." (T. 2217). The parties do not dispute the correctness of this language or its application to the facts.

believing that Contreras's surprise testimony, by placing a weapon in one of the joint participant's hands, bolstered this theory, the prosecution asked for a <u>Russell</u> jury instruction.

The trial court rejected the request, limiting the prosecution to the theory set forth in the bill of particulars it furnished to the defense, which stated that Hyman and Rabsatt, "acting in concert. . . engaged in a gunfight in an attempt to murder" Whitmore, and "fired several shots on a residential street causing a bullet to strike" Medina. (T. 2086). The court found that there was no evidence of pre-arrangement or of "the mutual combat killing zone . . . described in great detail in <u>Russell</u>." (T. 2008). The court also expressly prohibited the state from "argu[ing] a killing field scenario unsupported by the evidence." (T. 2089). (Inexplicably, in its post-gateway hearing brief, the prosecution nevertheless urges this Court to conclude that Hyman is guilty under <u>People v. Russell</u> merely because he was "present in one of the cars that was involved in the shooting." Respondent Post-Hearing Memorandum of Law at 47.

Instead, the trial court instructed on accessorial liability as follows:

Our law defines the circumstances under which one person may be criminally liable for the conduct of another. That definition is as follows: When one person engages in conduct which constitutes an offense, another is criminally liable for such conduct when, acting with the state of mind required for the commission of that offense he solicits, request, commands, importunes or intentionally aids such person to engage in such conduct.

Under that definition, mere presence at the scene of a crime even with knowledge that a crime is taken [sic] place or mere association with a perpetrator of a crime does not by itself make a defendant criminally liable. (T. 2214-15).

## 9. Verdict

The jury convicted Hyman of one count of second-degree murder, N.Y. Penal Law § 125.25(2), one count each of criminal possession of a weapon in the second and third degree, P.L. §§ 265.03(2), 265.02(4), and reckless endangerment in the first degree, P.L. § 120.25. The

jury acquitted Hyman of the separate charge of attempting to murder Jonathan Whitmore. The jury acquitted Rabsatt of all charges.[32]

### 10. Sentencing

At the start of the sentencing proceeding, held on May 15, 2002, Brettschneider advised the court that subsequent to the conclusion of the trial, he was able to locate and interview Amanda Benitez, and that she furnished a statement that refuted Ellis's trial testimony. (S. 6). Brettschneider acknowledged that his private investigator had obtained Benitez's statement prior to trial, but urged that the court treat it as newly discovered evidence because Benitez remained unavailable during trial. (S. 6-8).[33] The court treated the disclosure as a motion to adjourn to

---

[32]As noted, Whitmore's case was severed before Hyman's trial and ended with his plea to a weapons count and a sentence of five to seven years. Derek Harris, the individual supposedly standing in front of 1540 with Whitmore when the shooting broke out, was not named in the same indictment, and the record is not clear as to his role or fate. Also known as Mark Antony or Wiz, Harris is the brother of Hyman's girlfriend, Shakina, who figures in both the prosecution's and Hyman's speculations about why either Hyman, or Whitmore and Harris, may have had a motive to engage in a gunfight. At the gateway hearing, prosecution rebuttal witness Detective Kevin Cashen testified that Antony's name came up early in the investigation and that in an interview Harris stated, in substance, that he was standing in front of 1540 Hassock with someone named Shatell Johnson when he saw two cars come into the block, and that he did not pay them any attention because they belonged to his sister's boyfriend (*i.e.*, Hyman) (H3. 34). At Hyman's sentencing, however, Brettschneider mentions his "belie[f]" that "Mr. Harris got three years." (S.21).

[33] Within Hyman's ineffectiveness claim is the additional assertion that, because Hinkson furnished Brettschneider with Benitez's statement before trial, as Brettschneider acknowledges, Brettschneider was ineffective for failing to have secured her presence for trial. At sentencing, however, Brettschneider explains that, "as the district attorney brought up during trial, he was trying to locate [Benitez]," and "[a]t that time [he] didn't ask for a missing witness charge because [he was] also looking for [Benitez] in case the district attorney's office was unable to find her." (S. 6-7). He further explained that he did not know what Benitez would testify to at trial, but that if she chose to testify consistent with her police statement, he was prepared to impeach on the basis of the statement she gave Hinkson. Although not expressly abandoned, the branch of the ineffectiveness claim challenging Brettschneider's acts or omissions with respect to Benitez is referred to only in passing in Hyman's presentations before this Court, and is not further discussed here.

allow time to prepare a C.P.L. § 330.30 motion to vacate, and denied the adjournment request, noting that it was counsel's third sentencing adjournment request and admonishing counsel that C.P.L. § 330.30 relief requires a formal, written motion. (S. 9, 14-15).

Brettschneider nevertheless discussed the problematic nature of the verdict, returning to the principal points of his trial summation. Among other things, Brettschneider told the court that, "to this day, there has not been a reasonable explanation of how that weapon that allegedly was in Mr. Hyman's hands. . .ended up in the trunk of Mr. Whitmore's vehicle," and that each of the witnesses "had some bias through either relationships or friendships" with Whitmore or others. (S. 20).

Despite his conviction, Hyman passionately re-asserted his innocence. (S. 22-23). He insisted that he "was being fired upon that night as well," that he "almost lost [his] life in that car," and that he "never had a gun." (S. 23). He reiterated that "they were shooting up [his] car" and that, "[i]f [he] would have died in that car . . . they would have found no gun on [him]." He also emphasized that he "did the best thing" and "went to the police … didn't run from the law," and that it was "an injustice for an innocent man to go to jail for something he didn't do." (S. 22-23).

## B.    State and Appellate Post-Conviction Proceedings

### 1.    Direct Appeal

The appellate brief prepared on Hyman's behalf by public defenders raised a single claim, challenging one of the prosecution's peremptory challenges during jury selection; Hyman advanced several additional claims in a *pro se* supplemental brief, including that one of the witness's photographic identifications was suggestive, that the trial court erred in failing to issue

a missing witness instruction, that the murder and weapons possession convictions were inconsistent with the acquittal on attempted murder, and that the evidence was legally insufficient. The Appellate Division, Second Department, unanimously affirming the conviction, rejected each of these claims. People v. Hyman, 15 A.D.3d 417 (2d Dep't 2005). The appellate court held that the sufficiency challenge was unpreserved but that, in any event, it lacked merit, finding that "the evidence was legally sufficient to establish guilt beyond a reasonable doubt." Hyman, 15 A.D.3d at 417. Additionally, the court concluded that, "upon the exercise of [its] factual review power, [it was] satisfied that the verdict was not against the weight of the evidence." Id. The New York Court of Appeals denied leave to appeal. People v. Hyman, 4 N.Y. 3d 854 (2005).

### 2.     First State Post-Conviction Motion

In his first post-conviction motion to vacate pursuant to C.P.L. § 440.30(1)(a), Hyman sought DNA testing on the intact 9mm Intratech pistol found in Whitmore's car. He argued that such testing would reveal that he did not possess the weapon on the night of the shooting. The court denied the motion, concluding that because the gun was in Whitmore's car for nineteen days, it was subject to contamination. The court granted Hyman's motion to reargue and upon reconsideration, reaffirmed its initial ruling denying DNA testing. The Appellate Division granted Hyman leave to appeal the decision denying DNA testing and ultimately affirmed that decision, concluding that Hyman failed to show that DNA testing results would have resulted in a more favorable verdict. People v. Hyman, 51 A.D.3d 689 (2d Dep't 2008). The Court of Appeals denied leave to appeal. People v. Hyman, 10 N.Y.3d 960 (2008).

### 3. The Second 440

By motion dated July 7, 2008, Hyman moved in Queens County Supreme Court pursuant to C.P.L. § 440.10 for an order vacating his conviction on the ground of newly discovered evidence, pursuant to C.P.L. § 440.10(1)(g), based principally on the Ellis recant and the materials corroborating it, and ineffective assistance of counsel, pursuant to C.P.L. § 440.10(1)(h), based principally on Brettschneider's failure to call Investigator Hinkson or to pursue Benitez. In support, Hyman submitted a wealth of materials genuinely calling into question Ellis's credibility and Brettschneider's omission.

Starting with Hinkson, Hyman's second 440 motion papers included the investigator's signed and sworn affidavit in which he attests as follows:

> I was contacted by attorney Scott Brettschneider to conduct an investigation regarding [this] case prior to the commencement of the trial in the year 2002.

> At Scott Brettschneider's request I traveled to 1540 Hassock Street, Far Rockaway New York, and conducted an investigation regarding the [case].

> [W]hile at 1540 Hassock Street I went to the 3rd floor stairwell and hallway windows and looked out toward Hassock Street and determined that it would be impossible to observe the events of the shooting as described by certain witnesses, whose statements were provided to me by attorney Brettschneider from various police reports.

> I made a VHS video recording and took still photographs from the third floor windows aiming toward Hassock Street depicting the view from the third floor stairwell and hallway.

> The video clearly memorialized the fact that the witness could not have made the observations of the shooting as indicated in her statements to the police.

> I provided attorney Brettschneider with the original VHS videotape along with my opinion of the witness' ability to view the incident from the third floor stairwell and hallway windows.

> Thereafter attorney Brettschneider requested that I interview a witness named Amanda Benitez and she related that she was not actually present in the stairwell and hallway when the shooting occurred and was told by other

people what happened and relayed that information to the police when she was interviewed.

I provided attorney Scott Brettschneider with the witness statement of Amanda Benitez that was not signed or notarized as I was unable to locate Amanda Benitez after the initial interview to obtain her signature.

I requested payment from Scott Brettschneider for the services rendered and was told that Tully Hyman's family was responsible for the payment and would make the payment directly to me.

I spoke with Tully Hyman's father James Hyman and was told that he had paid Scott Brettschneider $2,500 for investigative services and to date I have not be[en] paid or compensated for the investigative services rendered . . .

I was never contacted by Scott Brettschneider regarding the videotape and still photographs from the third floor stairwell and hallway, and the interview of Amanda Benitez, nor was I requested or subpoenaed to testify at the trial of Tully Hyman. (Second 440, Ex. Q)

In a supplemental sworn affidavit, Hinkson further attests that he "gave attorney Scott Brettschneider the original VHS videotape that [he] made from the third floor windows of 154[0] Hassock," and that "[t]hat is the location from which Shaqu[a]na Ellis testified at trial that she observed the shooting." Hinkson Reply Affidavit dated Jan. 28, 2009.

As Hinkson states in his first affirmation, at the time of trial he had turned over to Brettschneider a statement of Benitez reflecting the content of his interview with her; Benitez later signed the statement under oath (on March 21, 2002), and that sworn document was also part of Hyman's Second 440 submission. Benitez there attests as follows:

On March 10, 2000, I spent most of the afternoon at my mother's house at 411 Beach 54th Street, Apt. 4G, Far Rockaway, New York. I left my mother's house and took a van to Mott Avenue and walked to the Redfern Projects. When I got to the Redfern Projects there were lots of police, yellow police tape and c[o]ps in the street in front of 1540 Hassoc[k] Street. I went around to another building connected to 1540 and climbed onto the roof to enter 1540. When I got inside I went to "Donald's" apartment on the third floor.

When I got in Donald's apartment Shaquana Ellis was there with Donald, Shameeka, Lionel, Johnny and Shaquanna Delain. Since I did not know what happened, I asked them to tell me what was going on. We could not leave the apartment all night because the police would not let us out. The next morning the police came to Donald's apartment to speak with us. Shaquana Ellis pulled me aside and told me to lie to the police and tell them I saw what happened. Shaquana told me a story to tell to the police about me seeing Tully shooting a gun at Jonathan. Shaquana Ellis was a friend of Jonathan Whitmore and Jonathan's friends. I never did see Tully that night because I was not there when everything happened.

The next morning the police took everyone to the precinct to question us. I told the police I was not there when it happened and I did not know anything. The police kept telling me that I did see what happened and if I did not tell them I would be arrested, [sic] I told them the story Shaquana had told me to say and they wrote it down. They told me I had to sign what they wrote or I would be arrested. I was scared they were going to lock me up so I signed the paper so I could go home.

The only reason I lied to the police and the DA is because Shaquana Ellis told me to. I was never at the Redfern Projects at the time that this shooting happened. I felt pressured by Shaquana Ellis and the police to lie and that's what [sic] why I did it. (Second 440, Ex. R).

In further support of the second 440 motion, Hyman submitted the signed, sworn affidavit of Stacey Manning, dated November 5, 2005, in which Manning recounts a telephone conversation she had with Ellis in the summer of 2002. Manning reports that Ellis "told [her] that she testified in the case dealing with Maria Medina's death" and that "Ellis further stated that she didn't see who was shooting, but [] only testified to help her cousin's baby's father, a guy named Jonathan Whitmore," whom Manning "also kn[e]w from around the Redfern Projects" because her (Manning's) family lives at 1540 Hassock Street. Manning also states that she advised Ellis to contact the District Attorney's office, and that Ellis told her she was afraid "they will lock her up for not telling the truth from the beginning." (Second 440, Ex. T).

Hyman also submitted the signed and sworn affidavit of Irwin Blye, a new investigator retained by Hyman's 440 counsel Robert DiDio. Blye reported that, on September 7, 2005, he

41

interviewed Shaquana Ellis, audiotaped the session, and remarked that background noise made the tape somewhat difficult to transcribe but that he had the original in his position, had furnished it to the prosecution, and offered to furnish it to the court.[34]

Ellis admitted to Blye that she did not witness the shooting or see Hyman firing a weapon, but that she testified that she did "[b]ecause somebody forced [her]." She stated, "I've been—my house—somebody was calling my house and threatening me." Blye asked Ellis where she was "when it actually – the shooting took place," and she replied, "I was in the building" and had been "that whole morning." She said that she had been with a friend of hers named Donald who does not live there anymore and that she only "saw it after." Pressed by Blye as to what she did see, Ellis said she had seen Hyman driving by before, but on day of the shooting she was inside the whole time because she had reason to believe something was going to happen that day, and that she "didn't actually see the shooting." She repeated that she was in apartment 3A when the shooting started; she heard it but didn't see it, and that the day after the shooting, someone threatened her and that is why she lied. She added that someone was calling her house telling her everything that had happened and what she should say when she talked to the police. She did not go back to the police and withdraw her statement because she didn't want to be convicted of something that she should never have gotten involved with in the first place. Ellis also told Blye that she had told a friend named Amanda that she didn't see the shooting. Finally, she told Blye that she felt "real bad" because Hyman does not deserve to be in jail. (Second 440, Ex. U).

---

[34] The recording in question was furnished, on a CD, to this Court, which finds the recording quite clear and Blye's summary of it, in his affidavit, to be fair and accurate. References here are to pages in a transcription prepared by the Queens District Attorney's office on April 8, 2015, and introduced as an exhibit at the gateway hearing. (R Ex. K).

Hyman's Second 440 counsel Robert DiDio, in his affirmations, explained to the Court that he had a personal telephone conversation with Ellis during which she admitted that she had not witnessed the shooting, that he prepared an affidavit consistent with this conversation and with her Blye interview, but that Ellis was reluctant to sign the document and was evading the private detective hired to locate her. A copy of the proposed Ellis affidavit was included; in that version, Ellis states that she was in apartment 3A and did not step out until the shooting had stopped, and she lied at trial because, the day after the shooting, she was threatened by people from the neighborhood, who instructed her to say that she saw Hyman firing a gun.

Also part of the Second 440 was the signed and sworn affidavit from Hyman's father, James Sanders. Sanders states that Brettschneider "collected from [him] twenty-five hundred … dollars to hire a private investigator" and that "although [he] paid trial counsel . . . he [counsel] never paid the investigator." In his view, "[b]ecause Mr. Brettschneider did not forward the money to Mr. Hinkson," Hinkson did not testify at trial. He reports: "Brettschneider claims he never received the mon[ey]s that I had paid for the investigative services, but I am positive I gave him the money." (Second 440, Ex P).

Justice Kenneth Holder, who did not preside over Hyman's trial, rejected both claims in an eleven-page written decision. People v. Hyman, Ind. No. 1787/00 (Sup. Ct. Queens Co., Aug. 4, 2009). The newly discovered evidence claim was denied on procedural grounds and the merits. Noting that "the purported retraction . . . is in the form of an audiotape, as well as hearsay statements allegedly made to others," Justice Holder concluded: "[a]s such, it [the recantation] is devoid of character and weight because none of the alleged retractions are sworn as required by C.P.L. § 440.30(1)." (This statement is incorrect inasmuch as the affidavits of Manning and Benitiez *are* sworn.) Justice Holder acknowledged counsel's affirmation describing

43

why there was not yet a signed, sworn statement from Ellis but nevertheless denied the request for a hearing at which she might be subpoenaed to testify on the ground that the court's jurisdiction did not extend beyond the borders of New York State.  Hyman, slip op. at 3-4.

Turning to ineffectiveness, as a threshold matter, Justice Holder certainly appreciated the gravamen of what Hyman was claiming; the decision states that Hyman "alleges that his trial counsel had an irreconcilable conflict with a private investigator which resulted in counsel's failure to produce certain exculpatory evidence," and that this failure was "a violation of the Sixth Amendment of the United States [sic]."  Id. at 4.  Justice Holder first held that "this portion of defendant's motion to vacate must be denied pursuant to C.P.L. § 440.10(2) because the defendant unjustifiably failed to raise the issue of alleged ineffectiveness of counsel in his direct appeal," and, in Holder's view, "sufficient facts appear[ed] on the record . . . to have permitted . . . adequate [appellate] review" of that claim.  Id. at 4-5 (quoting C.P.L.§440.10(2)(c)).  (The decision is plainly in error in this respect: although Brettschneider's failure to call Hinkson is established by the trial record, the content of Hinkson's investigation and conclusions, and the fee-related facts underlying the conflict-of-interest claim, are obviously *not*).

Before turning fully to the merits of the ineffectiveness claim Justice Holder concluded, separately, that Hyman's request for a hearing to develop the record should be denied because he failed to comply with the "sworn allegation" requirement of C.P.L. § 440.30, which provides, in pertinent part, that a motion for post-conviction relief may be denied without a hearing when "(b) [t]he motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts." N.Y.C.P.L. § 440.30(4)(b).

Justice Holder's ensuing analysis is a flawed blend of the procedural and the substantive: inventorying Hyman's copious submissions, he recognizes that with the sole exception of the unsworn Ellis statement, *all* the affidavits *are* sworn, yet nevertheless dismisses the substantive value of each affidavit other than Ellis's on grounds that are factually erroneous and otherwise too unacceptable to be protected by AEDPA deference. For example, Justice Holder notes that Hyman's father's affidavit, in describing "a disagreement between himself and trial counsel as to whether or not counsel was paid the money for the investigator," does "present[] a question of fact" – which ought to have contributed to concluding that a hearing was required, but instead resulted, in Justice Holder's assessment, in his conclusion that the affidavit is "conclusory." Id. at 6. Further, the court overlooked the fact that neither the state, nor Brettschneider, offered any affidavit or other evidence contradicting the fee-dispute averments of Hyman's witnesses.

Indeed, to this day, no court adjudicating these important issues has had any input from Brettschneider.

With respect to the critical submission from Hinkson, Justice Holder's description appears, at first, to reflect an appreciation of the detail and import of Hinkson's work, but then concludes that Hinkson "does not provide the name of the witness whose line of sight he was attempting to confirm nor does it establish that he was viewing the correct locations and landmarks." Id. at 7. Hinkson's materials, however, plainly *do* mention, by name, Shaquana Ellis and her claimed location as the subject of his analysis. As for the sworn Benitez affidavit, Justice Holder concludes that it "does not offer new evidence as to the issue of whether Ms. Benitez had been asked to lie by Ms. Ellis had been raised during trial." Id. at 8.

Turning to the merits, Justice Holder appreciated that "[Hyman's] accusation of ineffective representation . . . is centered around the testimony of Shaquana Ellis and whether

she was present and able to observe the defendant shoot a gun from a green vehicle as she testified at trial." Id. at 10.  The court then observed that "the record reveals that defense counsel cross-examined the witness aggressively as to her ability to observe and as to her motivation to lie," and—*despite the unrefuted affidavits attesting to the existence of a dispute concerning Hinkson's fee*—concluded that "[t]he choice of whether to call the investigator as a rebuttal witness may well have been a tactical decision which will generally not be second guessed by the court with regard to ineffective assistance of counsel." Id. at 10-11.

Failing to appreciate how crucial Ellis was to the state's case and, therefore, why impeaching her damaging testimony was so important, Justice Holder concluded that, in any event, Hyman had "failed to show that counsel's deficient representation actually prejudiced him." Id. at 11.  The court speculated that, "[i]f trial counsel had called the investigator as a rebuttal witness and he had testified in accordance with his affidavit, there is no way to know if the jury would have, at that stage, found his testimony so compelling as to discount the remainder of the People's case and acquit." Id.[35]

### 4.    Coram Nobis

In December 2009, Hyman moved for *coram nobis* relief, asserting that his appellate attorneys were ineffective for not arguing that trial counsel was ineffective for failing to make a sufficiency challenge, for failing to object to the verdicts as inconsistent, and for allowing the allegedly erroneous admission of the contents of an anonymous tip.  The Appellate Division denied relief, holding that appellate counsel was not ineffective.  People v. Hyman, 73 A.D.3d

---

[35] On or about October 15, 2009, the Appellate Division, Second Department denied leave to appeal Justice Holder's denial of 440 relief.

1211 (2d Dep't 2010). The Court of Appeals denied leave to appeal. <u>People v. Hyman</u>, 15 N.Y.3d 806 (2010).

## C.    <u>The Federal Habeas Proceeding</u>

As noted, after this Court appointed counsel, Hyman abandoned all the grounds for relief listed in his initial pro se petition except ineffectiveness and innocence.[36] In ensuing court conferences, the Court expressed to respondent its concerns about the trial record, and at the Court's invitation, the state conducted its own interview of Ellis at her home in Richmond, Virginia. Understandably wishing to subject Ellis's recant to cross-examination, the state proposed that the parties return to state court for that purpose. Specifically, the prosecution proposed that Hyman move, with the state's consent, to re-open the Second 440 proceeding where Hyman had already fully presented, and the court had rejected, both an innocence claim premised on the Ellis recant and the related ineffectiveness claim premised on Brettschneider's failure to call Hinkson. Although initially receptive to the proposal, Hyman re-asserted his request for an evidentiary hearing in this Court, at which he would seek to establish the allegations that he believed entitled him to habeas relief.

---

[36] Although in his initial petition Hyman pled actual innocence as a distinct substantive claim, he now concedes that innocence is not yet a ground upon which habeas relief can be awarded. <u>See</u> <u>McQuiggin</u>, 133 S. Ct. at 1931 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); <u>District Attorney's Office v. Osborne</u>, 557 U.S. 52, 71 (2009) (stating that whether a "federal constitutional right to be released upon proof of 'actual innocence'" exists is "an open question" that the Court "ha[s] struggled with . . . over the years"); <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence [are not] a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"); <u>but</u> <u>see</u> <u>DiMattina v. United States</u>, 949 F. Supp. 2d 387, 417 (E.D.N.Y. 2013) (Weinstein, J.) ("While refusing to accept the justiciability of a free-standing claim of actual innocence, the Court of Appeals for the Second Circuit has come close.") (collecting cases).

This Court granted the request by order dated September 17, 2015, limiting the hearing to Hyman's gateway innocence claim. The hearing took place on December 8, 2015, December 17, 2015 and January 19, 2016. On or about February 9, 2016, both Hyman and the state filed substantial post-hearing briefs addressing the credibility of the hearing witnesses and the validity of the conviction.

1.      **Hyman's Case**

a.      **Shaquana Ellis**

This Court appointed counsel to represent Ellis, and through counsel, a stipulation was read into the record pursuant to which the Queens County District Attorney's Office agreed not to prosecute Ellis for perjury relating to her 2002 trial testimony. (H. 4-5).[37]      Counsel for Ellis also reported that following a news report that Ellis would be testifying at the gateway hearing, she received a number of unsettling communications that had left her uneasy, and asked that Ellis's testimony with regard to certain anticipated sensitive subjects, including the naming of others involved in the shooting incident, be taken under seal. (The Court had also learned, prior to the hearing, that Ellis telephoned the Queens District Attorney to report that she felt threatened). The Court denied the motion to close the proceedings, and Ellis proceeded to testify that, in substance, she did not witness the shooting on March 10, 2000, and that her testimony at Hyman's trial was false.

At the time of the shooting, Ellis was 17 years old and lived in Far Rockaway, Queens, with her grandmother, though not in 1540 Hassock; she knew Hyman from the neighborhood

---

[37] Each day of the gateway testimony is referenced separately, with "H.," "H2.," or "H3."

since junior high school (H. 22-24).  She would often "hang out" at 1540 at her friend Donald's apartment, number 3A. (H. 24).

On the evening of March 10, 2000, Ellis came to learn that Maria Medina had been shot but she did not witness the shooting, and so did not see Hyman shooting or carrying a firearm. (H. 24-25, 26-27).  Asked whether she even "knew that he drove a green car," Ellis responded, "I knew that he drove a red car." (H. 27).  Walked through the principal components of her trial and grand jury testimony, Ellis reiterated a third time that it was "for the most part" all untrue:  she did not see Hyman pull up in a green car, did not see him hanging out of the window firing a gun or guns, and did not see any part of the shooting. (H. 35).

The basic recant having been delivered, an important subject of inquiry became where Ellis was now claiming to have been during the shooting (if not at the third-floor hallway window):

> Q.  Do you recall where you were . . . at the time of the shooting?
> A.  Well, I went to the store and then I stood outside the building for a little while.[38]  I had walked to the store.  Then after I came out [of] the store I stood in front of the building for a little while.  Then I heard the shots and I ran in the building.  I ran upstairs.
> Q.  [S]o…when you heard the shots, where were you?
> A.  When I heard the shots I was inside.  I was outside - - standing outside first, but th[e]n I ran inside the building.
> Q.  So you were physically outside of 1540 Hassock Street?
> A.  Yes.
> Q.  When the shots - -  when you heard shots?
> A.  Yes.
> Q.  And once hearing shots, you ran into the building?
> A.  Yes.
> Q.  And who . . . did you see fire a gun . . . ?
> A.  I didn't see anyone shooting.
> Q.  . . . after hearing those sho[]ts and running into the building, where did you go?
> A.  I went to Donald['s] house. (H. 25-26).

---

[38] After this first sentence the Court asked Ellis to speak a little more slowly.

When she got to apartment 3A, "a bunch" of people were there, including her friends Benitez and Delain. (H. 27).

Ellis specifically stated that her trial testimony was not true. (H. 28). Asked again where she was "when the gunshots went out," Ellis replied, in contrast with her testimony only moments earlier that she was running into the building, that she was "inside the apartment." (H. 28).

Hyman's counsel addressed the discrepancy:

> Q. Where were you when you heard the gun sho[]ts?
> A. When I heard the gun -- the first time I was outside, but I ran inside the building and I ran into the apartment. I stayed in there until then.
> Q. Did there come a time when you were in that apartment that you heard another series of gunshots?
> A. No, because it was a lot of music being played. (H. 28).

When questioning again returned to the subject of Ellis's location, she was again less than precise:

> Q. Now, you recall testifying that you were in that hallway of 1540 Hassock Street, third floor hallway, with Amanda and Shaquana Delain. Do you recall testifying to that?
> A. Yes.
> Q. Was that true?
> A. Yes.
> Q. You were in the hallway?
> A. Not -- I was inside the apartment, not the hallway.
> Q. Were you ever in the hallway, the third floor hallway, of 1540 Hassock Street on March 10, 2000 when the gunshots went off?
> A. After a little later on after.
> Q. While the shooting took place -
> A. No.
> Q. -- where were you?
> A. No.
> Q. Do you recall testifying at that trial that you were looking out the hallway window with Amanda and Shaquana when the shooting took place, do you recall testifying to that?
> A. Yes.
> Q. Was that the truth?

50

A. No. (H. 28-29).

Ellis confirmed that, when initially questioned on the night of the shooting she told police that she did not see anything. She testified that she was truthful *then*, and that the following morning she "voluntarily" took herself to the 101st precinct, along with Benitez, and that it was there that she first delivered the incriminating account of the shooting that became her trial testimony.[39]

Why? Here is Ellis's explanation:

Q. Why did you lie to the police, about seeing Mr. Hyman do the shooting, on March 11th, 2000?
A. Because that night, me walking home, my life and my family life was threatened. So I had no choice.
Q. Well, how were you threatened?
A. I had a gun pointed at my face.
Q. So, it would be fair to say, someone threatened to kill you?
A. Someone threatened to kill me and my family.
Q. Here is a tough question, who was that person?
A. I don't know. They had a hoodie and a bandana around the face.
Q. And what if anything did that person say to you, while the gun was pointed at your face?
A. That if I didn't go and point Tullie out in a lineup, that they were going to come kill me and my family that lived in a black and white house. So I figured I --
Q. Let me stop you there. The black and white house, was that an accurate description of the home you lived in?
A. Yes.
Q. After saying-- giving you the description of the house that you lived in, what else did that person say, if anything?
A. They just told me, to - - point Tullie out and let them know it was a red and green car at the scene.

THE COURT: "They," was there more than one person?
ELLIS: There was another person sitting in the car, a driver.
THE COURT: Tell me what happened, explain, you are walking home.
THE WITNESS: Yes, in the middle of the night.
THE COURT: And you are alone?

---

[39] Benitez would give a slightly different account: according to her hearing testimony, the police came to apartment 3A, remarked that Ellis and she were the only two left to be interviewed, and took them to the precinct for questioning.

THE WITNESS: Yes.
THE COURT: Tell me exactly what happened.
THE WITNESS: As I was walking, it was a car pulled right on the side of
me and one guy hopped out and pointed a gun at my face.
THE COURT: This was the passenger?
THE WITNESS: Yes, this was the passenger.
THE COURT: And the other person stayed in the vehicle?
THE WITNESS: Yes.

Q. Did you recognize any of those two?
A. No, I could not see a face.
Q. Could you tell their gender, male or female?
A. Male.
Q. Tell their race, white, black?
A. Black. I can just see the eyes; I could not see -
Q. And that took place when, Ms. Ellis, if the shooting took place on
March 10th, 2000, and you went to the police on March 11th, 2000, when
did this happen?
A. This happened in the middle of the night, I would say late night, I
don't know, maybe, one, 2:00 in the morning.
Q. After the shooting?
A. Yes, after the shooting. (H. 36-38).

Ellis maintained that because of this one incident, she lied to the police and to the grand

jury and that she continued to lie at the trial almost two years later because she still felt

threatened, since she still lived at the same Far Rockaway address, and because in the interim,

letters were sent to her grandmother's house calling her a "snitch bitch" or saying she was "going

to die." (H. 39-40).

Finally, Ellis confirmed the details of her interview on June 10, 2015, with the Executive

Assistant Queens District Attorney Testagrossa and an accompanying detective at a police

station in Virginia, during which she disclosed again that her trial testimony against Hyman was

false.

Several features of Ellis's testimony were effectively undermined on cross-examination,

as Ellis was pressed to be precise about whether she was on the street, entering the building or

already in the building when the first shots were fired, and whether she entered the building for

independent reasons or because of the shots. Ellis agreed that it was fair to say that gunfire began when she was outside the building and that it continued as she ran into the building and made her way to the third floor. (H. 52-53).

Ellis also claimed that when she first ran into apartment 3A and told Donald and the other people there that there was a shooting, no one there asked her anything about it. (H. 55). As to what occurred next, Ellis was inexact about when she and the others first came out of apartment 3A, and whether they stayed in the hallway or came down to the street. (H. 55-57).

Apparently endeavoring to elicit testimony arguably undermining Hinkson's sight line analysis, the prosecution asked Ellis about the hallway window:

> Q. Now, in the third floor hallway area, it does have windows that face out on Hassock Street, correct?
> A. Yes.
> Q. And were you able to look through those windows and look down on what was happening, you know, outside?
> A. No.
> Q. You didn't do it or you weren't able to do it?
> A. We weren't able to see. We w[ere] just looking out, but I don't - - I don't remember us trying to find out what was down.
> Q. I'm just asking you if you could look down from there and see the street, police activity, car traffic, whatever.
> A. I think it was sirens, but we could not see much. It was sirens. Well, police there, and it was just a whole chaotic.
> Q. It was chaos, right?
> A. Yes.
> Q. You saw the emergency lights that are on police cars and that kind of stuff flashing, right?
> A. Yes, by the time we got - - yeah. (H. 57-58).[40]

Ellis fared even more poorly when the cross-examination turned to the subject of the threat she claimed she received in the middle of the night after the shooting. Not only did the narrative lack the ring of truth when she first delivered it, but it was utterly destroyed on cross.

---

[40] Additionally, the prosecution managed to elicit from Ellis that there was "a rumor" – Ellis herself did not know –that Hyman and Whitmore "had a beef" or "had issues" and that it may have had something to do with a girl. (H. 92).

In what seemed to be on-the-spot fabrication, Ellis said she could not identify the threat-maker, although he addressed her by her nickname, Brown; she saw his eyes but not his nose because he wore a bandana; she could not describe the gun that was pointed at her; and it was he who not only instructed her to identify Hyman as the shooter but also specified the colors of the cars she should say were involved (green and red). (H. 60-64).

Further, Ellis could not suggest why, of all the people who were or might have been at 1540 Hassock on the night of the shooting, she was singled out and coerced by threat into testifying against someone she had known since junior high school. As for the letters that she supposedly received after this initial threat, Ellis offered that there were "maybe five" but was not sure, that she was not sure when they began, and that they were not addressed or mailed to her grandmother's house but instead, "[i]t [was], like, someone just put them there, placed them there." (H. 75). Consistent with her direct, Ellis testified that the letters stated "[s]nitch bitch. Rat. I'm gonna die. Things like that. Watch your back. Things like that." (H. 102).

Cross-examination also elicited that Ellis had a pattern of claiming to have been threatened and sometimes recanting that claim. Aware that her new gunpoint-threat claim does not match what she told Inspector Blye, for example, Ellis testified that this particular portion of her statement to Blye was untrue.[41] Ellis also recanted the report she made to the trial prosecutor of threats made against her by Hyman; her testimony now is that she lied about that. (H. 83). She maintained, however, that her most recent complaint—that she was threatened in the days before the gateway hearing—was true, but she did backpedal by asserting that she could not say who made the threats because they were done "indirectly," through a social media post that she did not see but was told about. (H. 84).

---

[41] To reiterate, she told Blye that she lied at trial because people were calling her house to threaten her.

Obviously aware that her most recent recant narrative did not entirely square with versions she had offered in the past, Ellis then proceeded to make the necessary, selective redactions. For example, having just testified that she had just arrived at 1540 when the shooting stared, Ellis then "admitted" that she lied to Inspector Blye in part: when she said she was in Donald's apartment when the shooting started, she was lying. She was also lying to Blye, she continued, when she told him that she "knew something was going to happen that day" and that that was why she had stayed indoors all day. She finally offered that, "a lot of what [she] said to [Blye] is not true" because "he came to [her] employment" and "[she] was trying to get rid of the guy." (H. 96-100).

Still, as the prosecution pressed from all angles and exposed inconsistencies and problems in her explanations for why she claimed to have lied, Ellis re-asserted that she did lie "about the whole, nearly the whole testimony of seeing, seeing [Hyman]." (H. 78). She insisted: "I didn't see anything. I just heard." (H. 78). On a narrow point of note, Ellis was also asked why, if she was coerced by threat into identifying Hyman as the shooter, she testified to seeing only a flame or flash as opposed to an actual weapon in his hand. She offered: "I don't know. I just was thinking about me and my family's life being threatened so I didn't - - I just was trying to make it convincing." (H. 72).

Trying to confine Ellis to a single threat narrative, the prosecution managed to elicit her confirmation that "the only time that [she] w[as] told what [she was] supposed to say to the police was in that face-to-face encounter [she] had on the street the early morning after the shooting." (H. 102). Ellis reiterated that she did not know that Hyman had a green car, but that "they" – clarified as "the unidentified threatener" – "gave [her] the description of the vehicles that [were] out there… that it was a red [car] and a green car." (H. 103). As for the remaining

details in the testimony she gave under oath at the grand jury and at trial, she "made them up [her]self" because "[she] had to make it convincing." (H. 105).

Certain matters became still murkier on re-cross, as the prosecutor elicited from Ellis that, although she had consistently testified that she *initially* told the police that she did not see anything, that initial questioning did *not* happen on the night of the shooting at 1540 Hassock. Instead, she now claimed, her first conversation with police occurred the morning *after* the shooting—and thus after the threat by the masked gunman. Cornered into admitting either that she was not influenced immediately by the threat, or that the threat did not occur, or that some other feature of the narrative was not true, Ellis then stated that she probably did not understand one of the earlier questions referenced by the prosecutor.[42] Ellis also clarified that she would not say that it was she who reached out to the defense investigator, and that it was perhaps fair to say that she was testifying at the gateway hearing because she was compelled to do so.

The Court also inquired of Ellis directly, asking her what prompted her to change her testimony. She replied: "I've been living with this lie for years and I just want the truth being told because I don't know if this man deserves to be in prison." (H. 105). She added that she "cannot live with this lie," wants to move on with her life, and that it was she who first came forward by initiating contact with the investigator. (H. 106). Ellis reiterated on redirect that she felt that Hyman had spent the last fifteen years of his life in prison "maybe on account of [her] testimony" and that she was very sorry. (H. 112).

---

[42] As will be discussed, Benitez and Delain both testified that Ellis was not at 1540 Hassock Street on the night of the shooting, and the basis of their claim is that neither saw Ellis arrive at apartment 3A, the regular gathering place of their shared circle of friends, until the following morning. Benitez's hearing testimony conflicts with her affidavit on this point, but she disavowed that portion of her affidavit at the hearing. Further still, Delain says she did not see Ellis "at all" whereas Benitez has her arrive sometime the morning after the shooting.

The prosecution did not impeach Ellis on this critical point.

Indeed, as addressed in the legal analysis *infra*, despite the many shortcomings in Ellis's various accounts, at no point in the long history of this case has the prosecution challenged Ellis's motive for recanting her trial testimony.

### b.    Amanda Benitez

Benitez, subpoenaed, travelled from her home in South Carolina to testify at the hearing in Brooklyn.[43]    Like Ellis, she was approximately 17 at the time of the shooting, and though not a resident of 1540 Hassock Street, lived nearby and often socialized there.  (H. 126).  (She moved away from Far Rockaway in 2007).  Benitez knew Ellis since the fifth grade and considered her one of her best friends. (H. 126-27).

Benitez's principal hearing testimony, contradicting a basic component of Ellis's trial account, was that she was not with Ellis at the window in the third-floor hallway when the shooting broke out.  Elaborating, she stated that she did not arrive at 1540 Hassock Street until after the shooting, when police had already secured the scene.  Because police were not letting anyone enter 1540, Benitez went into the neighboring building, crossed over the adjoining roof, took the stairs down to third floor and went to Donald Whitten's apartment. (H. 130-31).  Shaquana Delain and another friend, Shamika, were also in the apartment, but Ellis was not. (H. 131).[44]

Benitez further testified that Ellis first arrived in apartment 3A sometime the following morning.  Once Ellis arrived, the two had a conversation about the shooting. (H. 131-32).  Benitez testified that Shah, with whom Ellis was romantically involved, "wanted her [Ellis] to go

---

[43] Benitez testified under her married name, Martino, but for the sake of consistency within the discussion only, Benitez is used throughout this opinion

[44] Shamika is Donald Whitten's niece.  (H. 149).

and tell the detectives that Tullie Hyman was the shooter." (H. 132). Ellis told Benitez that Shah wanted Benitez to tell police the same story, but Benitez replied to Ellis that she did not want to. (H. 132-33). Still, they talked about the particulars Shah wanted them to describe, including that the colors of the cars were red and green and that Hyman "was hanging out of the car shooting." (H. 135-36). Benitez, hearing this information, still had not agreed to go along with the request that she tell it to the police; she asked Ellis why *she* was going to tell that story, and Ellis replied that it was because she did not want Shah to go to jail. Based on this conversation, Benitez believed that Shah had been involved in the shooting. Benitez was still telling Ellis that "[she] wasn't going to do it" when two detectives arrived at the apartment; Benitez and Ellis then stopped talking. (H. 136).

The detectives told Benitez and Ellis that, as the only two not yet interviewed, they would be taken to the 101st precinct. Benitez was so frightened at first that when asked her name (while still in the apartment) she lied, though she soon corrected herself. (H. 133-34). At the precinct, Benitez spoke to Detective Henson; at first she told him she didn't know anything because she wasn't there, but after he insisted that she must have heard something, she "told him the story that [she] heard that [Ellis] had told [her]." (H. 136-37).

The document memorializing Benitez's statement to Henson bears her signature and generally corroborates Ellis's trial account with Ellis-like details (including, for example, that she saw Hyman "sticking his head and arm" out of the green car and firing towards 1540). (R-EXH G29a).[45]

---

[45] A discrepancy between this Benitez statement and Ellis's account is that here (in R-EXH G29a), Benitez states that she witnessed the shooting from her friend Shaquana Delain's apartment, not from the third-floor hallway window.

In many respects, Benitez exuded credibility. She exhibited certainty, replied with poise and precision, and her overall demeanor conveyed a sense that she could be trusted. Her testimony was problematic, however, in one important respect: in a manner somewhat evocative of Ellis, Benitez sought to disavow *in part* certain of her prior statements. The first was the signed statement she gave police: at the hearing, Benitez testified that she signed the document only after she had read "[where] it said that [she] wasn't at the shooting but [that] this is what [she] heard [had] happened." (H. 137). She insisted that a sentence to that effect appeared on the document that she signed and that was why she signed it. (Id.). Shown the document, Benitez testified that she believed that this now missing disclaimer had appeared across the top, and insisted that Detective Henson also read the disclaimer aloud to her. (H. 138-39). Benitez clung to this position with remarkable persistence throughout the cross-examination by a prosecutor who did not conceal his apparent disbelief. (Indeed, it is in this respect that, despite engaging in an Ellis-like process of selectively disavowing former statements, Benitez survived, even thrived, under cross-examination, holding without compromise to the basics of her direct testimony).[46]

The second prior statement Benitez partially disavowed was the sworn affidavit submitted in support of Hyman's Second 440, which contains both a version of her claim that she did not see the shooting and her disavowal of her statement to police, and which, in *both* respects is *partially* inconsistent with her hearing testimony. Disturbingly reminiscent of Ellis, Benitez sought to address the inconsistencies by making selective redactions-by-disavowal.[47]

_____

[46] See, e.g., T. 154-160 (cross-examination accounts of initial arrival, police presence, Whitten's apartment, and arrival of detectives matches direct testimony); T. 167-174 (account of Henson interview and signing of statement); T. 175-184 (account of making and signing of affidavit in attorney Robert DiDio's office).

[47] Benitez did recall generally that investigator Hinkson interviewed her, that she told him she was not present at 1540 Hassock Street when the shooting occurred, and that sometime later

59

Benitez said she was generally truthful with Hinkson but not entirely so. (H. 140, 141). The Court allowed her to read her affidavit to herself, and to then identify which parts she considered inaccurate. She identified three. The first was "[w]here it says, since I did not know what happened, I asked [Ellis and the others in the apartment] to tell me what was going on." (H. 144). Benitez testified that that was not accurate, and that instead, it was her Uncle Hampton who had told her what happened as soon as she had arrived.

The second portion Benitez claimed was inaccurate was the assertion that "I got a letter from the D.A. before Tullie['s] trial [saying] that I had to go to the D.A.['s] office. That's not true." (H. 145). Asked if she ever received a letter from the District Attorney about testifying at Hyman's trial, Benitez replied: "No. The only people I thought who was going to lock me up was Detective Henson. That was the only person I thought was going to lock me up." (Id.). She continued, then, to defend why she signed the statement incriminating Hyman:

> Q. Why did you think that?
> A. Because he kept saying, like if I didn't sign the paper, that I wasn't going to see my mother.
> Q. So you signed the paper?
> A. Yes, sir.
> Q. You wrote it out to leave the 101st Precinct?
> A. Yes, sir. (H. 145-46).

The third inaccuracy in Benitez's affidavit, according to her hearing testimony, is the assertion that she felt pressured by Ellis to lie. She testified that she "didn't feel pressure" from Ellis. Asked why she "did it" (*i.e.*, signed a statement incriminating Hyman), Benitez testified, "[b]ecause . . . [she] didn't think that [she] was writing a statement saying that Tully Hyman was a shooter," and that "[she] was just telling them what [she] heard." (H. 146).

---

she went to a lawyer's office and signed an affidavit memorializing what she had said to Hinkson. (H. 140-41).

Cross-examination revealed that Benitez took the same position—*i.e.,* that Ellis had not pressured her to lie but had only told her what had happened—in her interview with representatives of the Queens District Attorney's office that occurred in 2015, as part of the limited inquiry triggered by the current petition. Benitez added, however, that she knew that what Ellis told her was not true:

> Q. She told you what she said she saw?
> A. What somebody told her to say.
> Q. Did she tell you that what she was telling was not the truth or did she tell that you she didn't know really what happened?
> A. *I knew it wasn't. She wasn't there, so how is it the truth?*
> Q. Well, how do you know she wasn't there?
> A. Because she had c[o]me direct from [sic] the next day. That's when I s[aw] her the next day. (H. 185-86) (emphasis added).

The prosecution elicited the following limitation:

> Q. You've been clear on that, but if you are in the apartment, as you said, you don't know who was outside the apartment?
> A. Right.
> Q. So, you don't know if [Ellis] was outside the apartment or in the street?
> A. Oh, I don't know. (H. 186).

Curiously, the questioning of Benitez did not return to the important matter of where, according to Benitez, Ellis was at the time of the shooting. As noted, Benitez testified, consistent with her 440 affidavit, that she did not arrive at 1540 until after the shooting; if true, that means that at least the portion of Ellis's testimony that places Benitez beside her at the third-floor window would be untrue. As also noted, Benitez has now recanted her former claim (in the 440 affidavit) that Ellis pressured her to lie, but nevertheless asks the Court to accept, as her confession of sorts, that she knew that when parroting Ellis at the precinct the morning after the

shooting, she (Benitez) knew she was telling an untrue story.[48]  Finally, as also noted, Benitez's

position is that she knew that Ellis's account of the shooting was untrue because Ellis "wasn't

there."  But in her 440 affidavit, Benitez plainly states that when she first arrived after the

shooting and made her way to apartment 3A, Ellis *was* there.  Whether the result of collective

oversight or other reasons, the hearing did not elicit clarification on this point.  (Again, in

assessing a rational jury's reaction to the overall record as supplemented by the hearing

testimony and evidence, the Court need not make a definitive "finding" with respect to where

Ellis was during the shooting; in any event, as will be discussed, hearing witness Shaquana

Delain also testified that Ellis was not at 1540 during the shooting).

Benitez briefly addressed several remaining matters.  First, Benitez offered clarifying

particulars to help the Court understand the contours of the possible feud between Whitmore's

camp and Hyman that has been hinted at throughout the advocacy in this case.  According to

Benitez, Hyman's girlfriend Shakina was Shakina *Harris*, the sister of Derek Harris, aka "Wiz,"

---

[48] Although the Court is not required to make specific findings with respect to every
factual matter that arises in the new testimony, it can share its reaction to Benitez in this respect.
On close inspection, her affidavit and hearing testimony offer an array of mixed motives for her
behavior at the police precinct on the morning after the shooting.  In the affidavit, Benitez states
that she "felt pressured by . . . Ellis *and* the police," and that the police "told [her] [she] had to
sign what they wrote," while at the hearing she both offered the account of the now missing
disclaimer, but also an explanation apparently independent of the phantom disclaimer – i.e., she
testified that she signed the document because Detective Henson "kept saying [that] if [she]
didn't sign the paper, that [she] wasn't going to see [her] mother"—which is arguably nearer the
plausible.  The Court is not persuaded that these inconsistencies are indicative of a general
dissembling nature of the Ellis variety or a reason to find Benitez untrustworthy on all matters.
Most likely, the excuse variations—including the claim of a missing disclaimer—are signs of
Benitez's battle with conscience.  She likely either wanted, or actually began, to tell Henson that
she did not see the shooting and only knew what Ellis told her, and if so there was also likely
some encouragement from Henson that she overcome her hesitation and deliver a statement.   At
the end of the day, Benitez was a teenager who apparently elected to simply back up her best
friend Ellis, and not long after, regretted it, leading her to dodge the prosecutor's efforts to secure
her presence at trial.  (H. 145-47).

who according to the prosecution was wielding the other .380 beside Whitmore, along the fence in front of 1540 Hassock Street. Asked whether "there was, like, some kind of misunderstanding between . . . Tullie and Jonathan over Shakina," Benitez replied, "It's not true . . [n]o." (H. 164). "It wasn't with Jonathan. It was with Mickey. Mickey was dating Shakina too at the same time Tullie was dating her." (Id.). Not only has Mickey previously been identified as part of Whitmore's inner circle (including having access to Whitmore's car), but Benitez added that Mickey is the brother of Shah, who, Benitez confirmed, was romantically involved at the time with Ellis, and who was the one who had first asked Ellis to say that Hyman was the shooter. (H. 164-65, 187). Benitez also confirmed that Mickey, Wiz, Whitmore, Shah and "all of them" were members of the dog pound crew, and that Hyman was not. (H. 189-90). Benitez clarified that she "didn't know" if it was "a problem" between Mickey and Hyman over Shakina; she "just knew that [Shakina] was seeing both of them." (H. 165). She also said that she had not heard any rumor or information that something was expected to happen on the night of the shooting. (H. 166).

In addition, Benitez testified that she was never called, contacted or subpoenaed to testify at Hyman's trial (H. 141). Although the state has argued that it would have called Benitez at trial if it was able to locate her, Benitez was not questioned further on this topic at the hearing. Later, however, during its rebuttal case, the state elicited testimony from the lead investigator that "a lot of work went into trying to locate [Benitez]." (H3. 34). Benitez added that, after she had spoken to Hyman's brother and learned that Hyman had been convicted, she came forward and agreed to speak to Hyman's lawyer. (H. 147).

Finally, Benitez testified that no one had threatened or coerced her into saying that she did not witness the shooting. (Id.). Indeed, nothing in the lengthy cross-examination elicited a

possible motive for why Benitez would travel to Brooklyn from her home in South Carolina, all these years after Hyman's trial, in order to lie under oath to exculpate him.

  **c.**  **Shaquana Delain**

  Shaquana Delain also travelled to the Brooklyn courthouse from her home in South Carolina in response to a subpoena from Hyman's counsel. She, too, lived in 1540 Hassock Street at the time of the shooting; her home was apartment 2D, but she was very familiar with apartment 3A, where Shamika and Donald Whitten lived, because she often "h[u]ng out" there with friends. Those friends included Ellis and Benitez: Delain testified that they all grew up together and she had known them both for more than fifteen years. (H2. 12-13).[49] At the time of the shooting, she had known Hyman for approximately five months because he was dating her friend Shamika.

  Delain's critical testimony is that, contrary to the core component of Ellis's trial testimony, she was *not* with Ellis and Benitez at the third floor window witnessing the shooting. (H2. 15-16, 21). To the contrary, Delain testified, she was in apartment 3A playing cards with friends (and had been there all afternoon, in fact) and only learned that a shooting occurred when someone (a building resident, not a police officer) knocked on the door to tell them. (H2. 12, 15-16, 32, 37). She had not heard any of the shots. (H2. 16).

  The others in apartment 3A at that time were Johnny Rutledge, Lionel Hill, Donald Whitten, and another friend named Shaquana, but not Ellis. (H2. 14). The Court sought clarification:

    Q. Had she been there at all that you, do you remember?

---

[49] Delain and Benitez currently live approximately 20 minutes from each other in South Carolina, and they had a conversation about this case sometime after Benitez testified in this Court, approximately a week before the day of Delain's testimony. (H2. 25-26).

  A. Shaquana Ellis?
  Q. Yes.
  A. No, she was not there at all. (H2. 15).


Delain confirmed this testimony on cross-examination:

  Q. Now, you indicated also that you never saw Shaquana Ellis in the
  apartment that day; is that correct?
  A. No, I did not see her.
  Q. So, yes, you never saw her that day?
  A. Yes, I never seen her that day.
  Q. And you're certain of that?
  A. Yes. (H2. 32-33).


After she learned of the shooting, Delain stayed in apartment 3A overnight; police were not letting anyone leave until the next morning, and that's when she left. (H2. 17). During their investigation, the police were knocking on apartment doors looking for witnesses. (H2. 17-18). When the police interviewed her, while she was still in apartment 3A, she stated that she neither saw nor heard the shooting. (H2. 18). Asked whether she recalled "ever" seeing Ellis "come into that apartment at any time on March 10th or March 11th of 2000," Delain replied that she "d[id]n't recall." (H2. 18). As for Benitez, Delain did recall that she came to the apartment shortly after the shooting. (H2. 19).

Delain, quite simply, was believable. She spoke with certainty and precision, did not have any prior statements to disavow, and did not reveal (nor has the prosecution even suggested) a possible motive to testify falsely in this proceeding. [50]

---

[50] An additional detail of note: in the Whitmore statement offered by the state in its rebuttal case, Whitmore says that one of the women sitting with him just as the shooting was about to begin was Shaquana Delain, but during its cross of Delain at the hearing, the state did not broach this subject.

### d. Private Investigator Kevin Hinkson

Although Hyman's counsel elected to call investigator Hinkson, his testimony essentially tracks the substance of his Second 440 affidavits and so does not add materially to the actual innocence analysis. In addition, to the extent Hinkson's testimony offers information in excess of those affidavits, the testimony does *not* enter into the merits assessment of the ineffectiveness claim. Cullen v. Pinhsolster, 131 S. Ct. 1388, 1398-99 (2011) (holding that review under § 2254(d) is limited to the record that was before the state court). Cullen likewise bars consideration for § 2254(d) purposes of the materials offered by the state during its rebuttal case at the gateway hearing that, according to the state, arguably call into question Hinkson's sight line conclusions.

In 2001, Private Investigator Kevin Hinkson was hired to conduct an investigation on Hyman's behalf. (H. 195-96).[51] Before trial began, he was directed to investigate the crime scene and to interview potential defense witnesses. (H. 196-97). After reviewing the police reports and the crime scene diagram, he proceeded to 1540 Hassock Street equipped with a video recorder, a 35mm camera and a tripod. (H. 197-98).

Upon his arrival at 1540 Hassock Street, he inspected the third-floor hallway and stairwell and took photographs and videos from the windows at those locations. (H. 199-201). Based on his review of the police reports and crime scene drawings, he concluded that from those locations in the building, it was impossible for anyone to have witnessed the shooting that took place on March 10, 2000. (H. 200-01). He conveyed his conclusions, along with the photographs and videos, to Hyman's trial counsel (H. 201).

---

[51] Hinkson has been a private investigator for 21 years, and before that, worked as a detective for the New York City Police Department for 12 years. (H. 195). He retired from the police department after 16 years of service after undergoing spinal surgery. (H. 195).

Hinkson also interviewed Amanda Benitez prior to the start of Hyman's trial (H. 201-02). Benitez told him that she did not witness the shooting and that she gave false statements to the detectives who were investigating the shooting. (H. 202). He prepared a report of this interview which he provided to Brettschneider. (H. 202).

Hinkson was never called or subpoenaed to testify at Hyman's trial. (H. 203). Nor was he directed to subpoena Benitez to testify as a witness for Hyman. (H. 203). In addition, he did not recall interviewing or being requested to interview any other potential defense witnesses. (H. 203). Finally, he was never paid for the services he provided to Brettschneider on Hyman's behalf. (H. 203-04).

Cross-examination elicited the following clarifying detail on the subject of the fee dispute:

> A. Mr. Hyman's father gave me an initial $500 retainer fee and I was supposed to get $3,000 for the whole job. When I went back to ask for the balance of the money, Mr. Hyman's father told me that he had given the money to Scott Brettschneider. And when I asked Mr. Brettschneider for the money, he said he didn't have it. And so, my relationship with this case ended because I wasn't paid.
> Q. Understandable. So, did Mr. Brettschneider say that he did not receive the other money or he just said he didn't have it to give to you?
> A. He said he didn't have it, so until I was paid, I wasn't going to do any further work. (H. 205-206).

### 2.    The Prosecution's Rebuttal

#### a.    Threshold Legal Concern

The state announced that it wished to present additional evidence of Hyman's guilt as a rebuttal case through now-retired Detective Cashen, who oversaw the murder investigation. The state's "intention [was] to give the Court an overview of the evidence in th[e] case, some of

which was admitted at trial, but some of which never appeared at the trial, which points towards the guilt of the defendant." (H3. 2-3). Although offering a voluminous set of materials that were part of the police investigation, the state said it was relying "in particular [on] two statements of witnesses who did not testify at trial . . . who identified [Hyman] as the perpetrator of the crime." (H3. 5). Those witnesses are Jonathan Whitmore and Joseph Howard. Whitmore's statement is in the form of a videotape of his interview at the police precinct conducted the day after the shooting and lasting approximately 21 minutes; Howard's statement is in the form of several DD-5's summarizing his interviews.

This Court expressed reservations: "That's kind of a curious element. [You] [c]ertainly don't intend to 'convict,' I will put that word in quotes, this gentleman on the basis of evidence that wasn't permitted at the trial, which is as a practical matter what you are suggesting now." (H3. 3).[52]

Sweeping language in the Supreme Court's actual-innocence decisions (discussed more fully *infra* at Part III), understandably relied on by the prosecution, arguably invites such rebuttal proof of guilt. For example, in <u>Schlup v Delo</u>, 513 U.S. 298 (1995), the Supreme Court states that "the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the

---

[52] At another point in the discussion, the Court remarked:

> You know what's troubling me about this? Let's assume that -- I will give a hypothetical -- that it is clear beyond any question at this stage that Mr. Hyman -- no. Let me start again. It is clear beyond any question that the one witness implicating Mr. Hyman is lying. Just assume that. What troubles me about it is, in this court, in the context of the actual innocence examination, to permit the petitioner to address the merits we are going to introduce additional evidence -- whether it was admissible at the criminal trial or not is unimportant to me at the moment -- we are going to introduce additional evidence which will, in effect – that's why I use the word "conviction" in quotes -- in effect you have offered to review. Something about that is troubling. That's really a matter for the state court and a new trial. (H3. 7).

probative force of relevant evidence that was either excluded or unavailable at trial." 513 U.S. at 327-28. Likewise, in House v. Bell, 547 U.S. 518 (2006), the Court again instructs that, when evaluating an actual innocence claim, the habeas court's analysis "is not limited to [the new] evidence" but "must [include] all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." 547 U.S. at 537-38 (internal quotations and citations omitted).

Still, absent Supreme Court holdings, or even dictum, of greater specificity, the Court remains doubtful that a habeas petitioner's gateway innocence claim, which is pursued for its capacity to cure a procedural defect but not as an independent ground for release from custody, can open the prosecutorial floodgates as the state argues here. A different set of considerations might exist were the Court being told that, by virtue of additional, post-trial investigation, the state had unearthed new information probative of what occurred on March 10, 2000 in front of 1540 Hassock Street—but that it not what occurred. Instead, the state simply wishes to empty out its old file and introduce materials that unquestionably were available at the time of trial but that either the state elected not to or were clearly inadmissible.

The state's position here crystalizes the question: do all the adjectives in the House standard ("all the evidence, old and new, incriminating and exculpatory," admissible and inadmissible) apply to each other, so that evidence that is "old," "incriminating" and "inadmissible" may now be showcased? Or, instead, does the combination of "old" and "incriminating" merely refer to the state's case at trial? One detail in the relevant language in Schlup may offer a clue: as noted, Schlup authorizes consideration of evidence that was either "excluded or unavailable at trial," but only two sentences later appears a limiting restatement of the same idea: "The habeas court must make its determination concerning the petitioner's

innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence *tenably claimed to have been wrongly* excluded or to have become available only after the trial." 513 U.S. at 328 (internal citation and quotation omitted).

In this regard, the Court detects a lack of candor in the state's presentation. First, in its post-hearing brief, the state's treatment of this important issue reports only the earlier-appearing Schlup language but not the later sentence limiting "excluded" evidence to evidence that was "wrongly" excluded. Second, consistent with this omission, the state did not even seek to argue that Jonathan Whitmore's statement was "wrongly" excluded at trial. Third, at the gateway hearing, the state shared only that Whitmore's statement incriminating his codefendant "of course, under Bruton and Cruz . . . was not admissible." (H3. 5) — the references are to Bruton v. United States, 391 U.S. 123 (1968), and Cruz v. New York, 481 U.S. 186 (1987)—but concealed from this Court the fact that the prosecution *did seek* to admit Whitmore's statement at trial on alternate grounds. (T. 1738 et seq.). The prosecution argued there that, notwithstanding Bruton, Whitmore's statement was admissible in a redacted form as a declaration against penal interest made by one of the members of a group charged with jointly "picking a time and place to have the shootout." (T. 1749). (The state further argued that the corroboration required for such declarations was satisfied by the surprise testimony from Contreras that she saw Whitmore carrying a gun.). The application was premised, in other words, on the same Russell-based "killing field" theory that, as discussed, was to be rejected at the charging conference. The trial court ruled Whitmore's statement inadmissible, though not in anticipation of its later rejection (at the charging conference) of the Russell theory; instead, the court ruled that, because Whitmore

offered a justification for his conduct, his statement was not sufficiently against penal interest. (T. 1756-57).

At the hearing, the Court allowed the prosecution to present its rebuttal case while directing further briefing on the question. Those materials, and the Court's own research, have not decisively resolved this feature of actual innocence analysis; the consensus is that the issue is an open question in this Circuit. See Williams v. Bradt, 10 CV 3910 (DLI), 2016 WL 1273228, *11 (E.D.N.Y. Mar. 30, 2016) ("it is an open question in this Circuit whether evidence, to qualify as 'new' for purposes of an actual innocence claim, must have been unavailable at the time of trial, or simply not presented to the trier of fact at trial"); Bowman v. Racette, 12 CV 4153, 2015 WL 1780159, *3 (S.D.N.Y. Apr. 20, 2015) (reads Rivas as favoring an "holistic" approach); Tuitt v. Martuscello, 12 CV 1003 (CS), 2013 WL 5508385, *15 n. 16 (S.D.N.Y. Oct. 3, 2013) (collecting cases from other Circuits).[53] Nevertheless, even assuming a broad interpretation of the phrase "all the evidence," the Court has serious doubts that Schlup and House are to be construed as overruling, in the actual-innocence context, the bedrock constitutional principles underlying Bruton and Cruz.

The Court, however, need not reach the legal question at this time because, even assuming that the state's rebuttal materials are properly included in the gateway innocence analysis, the Court nevertheless concludes that Hyman prevails on his gateway claim.

---

[53] Of note, too, is Bousley v. United States, 523 U.S. 614, 623 (1998), where the conviction being challenged was obtained by plea. Remanding with directions to hold a hearing on a section 2255 petitioner's actual innocence claim, the Court ruled that, "the Government is not limited to the existing record to rebut any showing that petitioner might make [but] should be permitted to present any *admissible* evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy." Bousley, 523 U.S. at 624 (emphasis added).

### b. The Prosecution's Rebuttal Evidence

#### i. *Whitmore's Statement*

The prologue of Whitmore's narrative, and indeed, the entire premise offered for his conduct on the night of the shooting, is a generalized, unsubstantiated—and in this Court's view, patently incredible—claim that he had reason to be afraid of Hyman because of a note left on a friend's car and not addressed to him that he interpreted as a threat from Hyman to him. Whitmore never saw the note, could not specify when or on which friend's car it was left, but he stated that he was told about it by a friend. Whitmore's recollection of this friend's account is that the note stated that its author hoped that "he was bulletproof."[54] Whitmore said that he "knew it [the note] was for [him]" because it was signed "red Ac"—a reference to Hyman's vehicle. [55] This mysterious note has not surfaced.

---

[54] The relevant exchange is as follows:

Whitmore: So somebody from where I live at, was trying to talk to this girl something like that or whatever, and somebody thought that it was me, cause my name pops up every time something happens or whatever.

Q: When you say this girl, what girl do you mean?

Whitmore: I don't even know the girl. Tully's girlfriend. Someone tried to talk to her and she tells him and my name comes up. I have a girl down there already so why would I even violate like that. So he hears this so instead of trying to talk to me or asking me, he comes to my block and leaves a note on a car that's not even mine but the note is towards me, telling me that I hope you're bulletproof or something like that.

[55] The relevant exchange is the following:

Whitmore: . . . I knew it was towards me.
Q: What made you think it was towards you?
Whitmore: Because he said, he's telling…the Red Acura, the Red Ac.

Whitmore stated that he did not know Hyman personally but only knew "of him," yet he displayed a remarkably precise knowledge of Hyman's vehicle ownership history: he stated that whenever he saw the red Acura driving around the building, he knew it was Hyman, but that the red car now belonged to his brother, and that Hyman "now. . . has a green Mazda MX6" that "he bought about two weeks ago."

Whitmore said that whenever he saw the red Acura driving by, he would run or hide in a store until the car passed. But one day, he decided, "So, I'm either gonna keep duckin[g] for the rest of my life or protect myself," and so, "as of Friday night" (March 10, 2000, the night of the shooting), he kept a gun inside a box inside a bag just over the fence in front of 1540; he clarified: his friends told him that the red car came through again, so he placed the bag containing the gun where he could retrieve it by reaching his hand through the fence. Then, while sitting there talking to two girls (one, he said, was Shaquana Delain), he saw the green and red cars pull up, "the green car in front and the red car behind it."

As noted, this detail—the positions of the two cars—is in conflict with the trial testimony of Ellis, Burton and McCoy. Additionally, in contrast to the prosecution's theory, which places codefendant Derek Harris alongside Whitmore outside 1540, Whitmore does *not* mention Harris.

Whitmore continued: he quickly pushed the girls away and urged them to go inside because he didn't want anybody innocent getting hurt. Then, Hyman and whoever else was with him—he could not tell for sure—rolled down the window and just started firing in his direction. Whitmore continued, "So now for me, I'm just trying to get away from all this or whatever, I just reach over, no, I slip my arm through the gate and get the box and the bag where I had the gun [ ] just blasting back." Then he was "fleeing the scene," and he was telling the people in the lobby

to get out of the lobby. "That's my mother's friend from the building," he said of Medina, "they do tenant patrol, they [are] all like one family in that building."[56]

The narrative continued: he ran up the stairs but stopped on the first floor to look out and make sure the cars were leaving. Asked again about the relative position of the green and red cars, Whitmore repeated that the green car was in front of the red car. Once in his mother's apartment, he put the gun in its box, then the box inside a bag, tied up the bag and threw it out his mother's window.[57]

He said he had the gun for several weeks, and that it was a .380 that he stole from his cousin. "The box" to which he had referred was the box that the gun came in and the plastic bag was black. Whitmore said he typically stored the gun in this manner at night so one would see it in the grass.

Asked to offer additional details on the shooting, Whitmore said that he saw an arm extending out, he saw Hyman's face and arm, then lights and sparks. As for the number of shooters: he was sure that there were two people in the green car—an assertion that directly contradicts Ellis's account, which has Hyman alone in that vehicle. Whitmore was not as sure about the number of people in the red car because its tinted windows made it difficult to see. How many shots did Whitmore himself fire? "Seven shot clip, I emptied the clip." And yes, he reiterated, he was running towards the 1540 building while shooting at the green car.

---

[56] As noted, Hyman's trial theory was that Ellis and the other eyewitnesses were tainted by a pro-Whitmore bias owing to their close relationship with his mother, a long-time resident of 1540. Whitmore's credible spontaneous remark here both characterizes the building's residents as "all like one family" but also reveals that his mother had this additional bonding link with the victim Maria Medina and witnesses Margaret Contreras and Lynn Burton.

[57] In a written statement made to Detective Quinn later on that day, Whitmore did not make this admission about the weapon.

Returning to the subject of why he was afraid of Hyman, he said, no, he never had any conversation with Hyman. He was "just going by what [he] hear[s]." He wanted to talk to him, however, to try to work things out.

Returning yet again to the number of participants, Whitmore said, there "had to be two people" in each of the cars, because he saw a passenger in each. "Two people, guaranteed," he said. There might have been even more in the red car, but he couldn't see because of the tinted windows. As for the weapons used, no, he "couldn't see what guns they had in the cars. Couldn't say this was a 9mm or that was a .45."[58]

In this Court's view, any rational factfinder would be unlikely to credit the bulk of Whitmore's egregiously self-serving, untested assertions. Even assuming for the sake of argument that one could excuse his inability to offer any particulars about the note allegedly left on a friend's car, Whitmore still fails to offer any plausible basis for his decision to interpret the note as a threat to him, or for his decision to forego "ducking" whenever he saw the red Acura and instead ready himself for a gunfight. His "guarantee" that there were two people in the green car, and his certainty that the green car was in front of the red car, are in stark conflict with critical features of the controlling trial account offered by Ellis—and, if any inference is to be drawn from that fact, it is most likely one of rehearsal gone awry. His failure to mention that co-defendant Derek Harris was with him in front of 1540 is in conflict with the version of events the prosecution presented to the jury, and thus calls into question the validity of that version (or, alternatively, renders suspect the prosecution's claim, now, that Whitmore's statement would have bolstered its case at trial.) Finally, it cannot have been mere coincidence that, when disavowing knowledge of the guns fired from the cars in the street, Whitmore mentions precisely

---

[58] Earlier, Whitmore gave a similar statement memorialized in writing. (H3 23-25).

the two guns actually used and later found in his car.  In short, the prosecution's resort to Whitmore's statement at the gateway hearing as a sort of smoking gun is difficult to explain; if introduced to rational jurors, their reaction would have to be an even further loss of confidence in the overall investigation.

<em>ii.      Joseph Howard</em>

Joseph Howard was interviewed twice, once by Detective Black, on March 11, 2000, and four days later, by Detective Bardin. (H3. 91-92; R EXH G-31 G-70).   In his first interview, according to the DD-5, Howard stated that just as he was walking out of 1540 Hassock Street shortly after 7:00 p.m. on March 10, 2000, he saw a red four-door sedan with three black males in it.  He was about 20 feet from the vehicle when one of the black men got out and fired approximately thirty shots, while the others stayed in the car, in the driver's seat and back seat. The weapon looked like a 9mm or a .45.  The shooter was dark-skinned, wearing a black ski cap, and after firing, got back in the car, which immediately sped off.

In his second interview, according to the DD-5, Howard offered an additional detail. Instead of being right in front of the building, as he had first stated, he now claimed that he had already walked as far as the bus shelter on Beach Channel Drive, approximately 50 feet from the intersection with Hassock Street, when he heard a car skid to a sudden stop.  He turned and observed a red Acura with tinted windows stopped in the intersection, and then saw an armed black male wearing a ski cap pulled over his forehead exit from the front passenger side; the man said "F—k that let's do this," then Howard saw flashes and heard approximately 20-30 shots, some appearing to be return gunfire.  He also observed a black Jeep following directly behind the red Acura as though the two cars were together.  Later, Howard selected petitioner from a photo array and identified him as the shooter.

At the start of its rebuttal case, the prosecution told the Court that it "d[id]n't have a definite reason why [Howard] didn't testify" but that, based on the police reports, Howard was "very, very difficult to find at the time of the investigation and not cooperative." (H3. 5-6). None of the referenced reports, however, so indicate. The prosecutor also advised that it had been in contact with the assistant district attorney who tried the case, who was no longer with the office, and that he "didn't really recall what happened with Mr. Howard." (H3. 7), but the prosecution assured the Court that that Detective Cashen "has the answer." (H3. 6). Cashen, however, never offered a reason why Howard did not testify.[59] The Court certainly would have welcomed a candid explanation for Howard's absence from the trial.

In this Court's view, no rational factfinder would assign significant weight to this evidence. Despite having identified Hyman in a photo array as a shooter, Howard would not likely advance the prosecution's case because his two statements place him, as a witness, in two very different locations, and more critically, his story conflicts too materially with Ellis's for a jury to accept a prosecutor's decision to offer both his and her accounts. Whereas Ellis told the jury that Hyman shot from *inside* the *green* car, the person Howard identified as Hyman was firing after he *exited* a *red* car. In addition, as discussed, what other witnesses initially described as "dark colored" and "black" later became "green" when they were shown a picture of Hyman's vehicle, but the dark car Howard says he saw behind the red Acura was a Jeep, which cannot plausibly be confused with the green Mazda MX6, a sports car.[60]

---

[59] Cashen also disclosed that the photo array shown to Howard was missing from the police file. (H3. 107-108).

[60] Some of the many other materials the state offered in its rebuttal case, all of which were available at the time of trial, include police reports summarizing interviews with other uncalled witnesses who saw isolated parts of the shooting but did not identify Hyman as a shooter.

# III.    STANDARDS AND FINDINGS

## A.    <u>Actual Innocence</u>

### 1.    Generally

As noted, the actual innocence standard requires the Court to engage in a uniquely comprehensive and probing factual review.  As the Supreme Court summarized in <u>House v. Bell</u>, 547 U.S. 537 (2006), a habeas court's analysis of an actual innocence claim "is not limited to" the new evidence offered at the gateway hearing but instead must include

> all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under [the] rules of admissibility that would govern at trial.  Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do.  The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

<u>House</u>, 547 U.S. at 537-38 (internal quotations and citations omitted).  <u>See</u> <u>also</u> <u>Doe v. Menefee</u>, 391 F.3d 147, 163 (2d Cir. 2004) ("[T]he reviewing court must do more than reenact a trial of the petitioner; it must be free to evaluate independently all of the evidence, old and new, to determine whether that evidence may show that the petitioner is factually innocent.")

The Court in <u>House</u> further explained:

> At the same time, though, the [ ] standard does not require absolute certainty about the petitioner's guilt or innocence.  A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

<u>Id.</u> at 538.

Critically, the Supreme Court also distinguished actual-innocence from traditional sufficiency analysis:

[T]he gateway actual-innocence standard is by no means equivalent to the standard [that] governs claims of insufficient evidence. When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict. Because a[n] [actual-innocence] claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. If new evidence so requires, this may include consideration of the credibility of witnesses presented at trial.

Id. at 538-39 (internal quotations and citations omitted).

In addition, as the Court explained even earlier, in Schlup v. Delo, 513 U.S. 298, 330 (1995):

more fundamentally, the focus of the inquiry is different under *Jackson* [*v. Virginia, 443 U.S. 307 (1979)*] than under [the actual-innocence test]. Under *Jackson*, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under [the actual-innocence test], the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

513 U.S. at 330. See also Stephenson v. Connecticut, __ Fed. App'x __, 2016 WL 730502, at *2 n. 2 (2d Cir. Feb. 24, 2016) ("[I]t is easier for a petitioner to meet the gateway standard than to win on a sufficiency challenge.")

## 2. The "Credible" Prong

The actual-innocence standard is generally understood as announcing a two-part test: to succeed, the gateway innocence claim "must be both 'credible' and 'compelling.'" Rivas v. Fischer, 687 F.3d 514, 541 (2d Cir. 2012) (quoting, House, 547 U.S. at 521). "[T]o be 'credible,' [the claim] must be supported by 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Id. (quoting Schlup, 513 U.S. at 324). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double

negative, that more likely than not any reasonable juror would have reasonable doubt.'" <u>Rivas</u>, 687 F.3d at 541 (quoting <u>House</u>, 547 U.S. at 538).   Following suit, courts adjudicating actual innocence claims typically treat 'credible' and 'compelling' as distinct analytical prongs of the <u>Schlup</u> standard.  <u>See</u>, <u>e.g.</u>, <u>Diaz v. Bellnier</u>, 974 F.Supp.2d 136, 143-44 (E.D.N.Y. 2013) (Brodie, J.) (petitioner's submissions were not of the type "required to meet the first <u>Schlup</u> prong [of] new reliable evidence" but assuming it did, "the evidence also did not meet the 'compelling' prong of <u>Schlup</u>") (internal quotation and citation omitted); <u>Lopez v. Miller</u>, 915 F.Supp.2d 373, 409-410 (E.D.N.Y. 2013) (Garaufis, J.) (first making conclusions "on the 'credible' prong" and next determining "whether [the claim] is 'compelling'").

In this case, however, the "credible" and "compelling" prongs arguably overlap because the "reliability" of the new evidence bears directly upon the credibility of key trial witnesses. Assuming without deciding, however, that the "credible" prong requires separate discussion, the Court finds that Hyman has produced the required "new reliable evidence." <u>Schlup</u>, 513 U.S. at 324.[61]

First, assuming that the Court need conclude only "that at least one of [the petitioner's] [] pieces of new evidence is reliable" before moving on to the "compelling" prong, <u>Lopez</u>, 915 F. Supp. 2d at 400, n. 15, it can readily do so and declare the "credible" prong satisfied, as the written Hinkson materials and the affidavits of Manning, Blye, and Sanders all qualify.  The documents are all sworn; the affiants were on notice to the possibility that they would later have to testify to the same matters; and the state has not offered evidence to contradict them.

---

[61] The "new" requirement does not require discussion.  The gateway hearing testimony of Ellis, Benitez, Delain and Hinkson, as well as the large set of materials submitted at the Second 440 stage (the affidavits of Hinkson, Benitez, Blye, Sanders, and Manning) are unquestionably "new."  <u>See</u> <u>Rivas</u>, 687 F.3d at 543 ("new evidence" is "evidence not heard by the jury").

Hinkson's gateway testimony largely echoes his affidavits, so that also qualifies, as does the hearing testimony of Shaquana Delain, which the Court has found to be generally credible.

In any event, even assuming without deciding that each separate component of the new evidence (*i.e.,* the separate sworn gateway hearing accounts offered by Ellis, Benitez and Delain) must qualify under the "credible" prong, the Court concludes that each does.

Recants of course are inherently problematic,[62] and Ellis's, in certain respects, was especially so. To be sure, Ellis was at her least credible before this Court (i) when offering the palpably implausible account of the gunpoint threat; (ii) when conveniently disavowing select portions of her earlier statements where they conflicted with recent testimony; (iii) in habitually advancing and then retreating from threat claims; and (iv) when evading precision about where, if not at the third-floor window, she actually was when the shooting began. Nevertheless, the crucial and dispositive question is whether there is truth to the core premise of the recant, namely, that Ellis did not see the shooting and lied at Hyman's trial. The answer to that question, this Court concludes, is yes. For all of her false starts (the earliest dates back to the confession she made sometime in 2002 during a telephone call to her friend Stacy Manning, as recounted in Manning's Second 440 affidavit), Ellis has stood by the core of her recant for more than a decade. Her critical admission rings very true given the other evidence presented, and

---

[62] "Courts have routinely recognized that witness recantations 'must be looked upon with the utmost suspicion.'" <u>Brown v. Woods</u>, 07 CV 0058 (DLI), 2009 WL 789443, *7 (E.D.N.Y. Mar. 20, 2009) (quoting, <u>Haouari v. United States</u>, 510 F.3d 350, 353 (2d Cir. 2007)). As with any witness testimony, however, "the court evaluates recanted testimony 'in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require.'" <u>Castillo v. Ercole</u>, 07 CV 11256 (LAP), 2009 WL 1492182, *6 (S.D.N.Y. May 27, 2009) (quoting <u>Doe v. Menefee</u>, 391 F.3d 147, 164-65 (2d Cir. 2004), <u>cert. denied</u>, 546 U.S. 961 (2005)).

given the fact that, in all the years that the recant has been a subject of litigation, the state has not produced any evidence, or offered any argument, impugning Ellis's *motive* for recanting.

In short, the Court's months of deep reflection upon this troubling case inevitably circle back to this feature of the record, and this question: why didn't Ellis let sleeping dogs lie? Why emerge from the relative safety and anonymity of a post-trial life far from a Brooklyn courtroom and re-enter the fray, only to deliver a false-to-the-core recant? Though Ellis is a facile liar, the Court does not believe her to be a gratuitous one who would orchestrate this prolonged post-trial epilogue merely for the pleasure of delivering another fabrication. Instead, in this Court's view, it is only the pangs of conscience that can explain it, for only they reverberate in this way and for this long. The Court is convinced that Ellis indeed wished to correct her false accusation against Tullie Hyman but, without the privacy of a sealed courtroom, remained unwilling to tell the whole truth.

Accordingly, for purposes of the "credible" prong of the Schlup standard, the Court concludes that Ellis's hearing testimony reliably supports the narrow proposition for which it was offered, namely, that the dramatic eyewitness account Ellis offered against Hyman was false. Indeed, this assessment is nearly unavoidable when examined in the light of all the available evidence, including Hinkson's sight-line analysis and the gateway testimony of Benitez and Delain.

The problematic aspect of Benitez's testimony is, likewise, not fatal for purposes of the "credibility" prong of the Schlup test. Despite the selective disavowals of portions of her Second 440 affidavit and the patent incredibility of her claim that she signed a document containing a now missing disclaimer, there was no evidence or argument suggesting why, after dodging the trial in the first place, Benitez would come forward fifteen years later to deliver essentially false

testimony about 5her long-time friend Ellis.  Thus, the Court finds that Benitez's hearing testimony reliably supports the narrow point for which it was offered, as independent proof that Ellis was not present during the shooting and thus as corroboration of the basic premise of the recant.

### 3.    "Compelling"

The conclusion is inescapable: "more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt" about Hyman's guilt.  House, 547 U.S. at 538. For all that the flawed ballistics evidence could reconstruct, at the end of the day the prosecution's case was no more than a set of hypotheses, or at best a script without identifiable characters: it was only Ellis who gave jurors grappling with the evidence a point of focus by identifying an actual protagonist firing a gun.  Not only that, but she added details that made her testimony riveting (the double-fisted firing), convincing (the "flashes" but not the guns) and authoritative (the face she saw was one she'd known since junior high).  The glue that held together a fragmented case, the trump card that camouflaged the many weaknesses already discussed—whatever the metaphor, it is clear that unless Ellis's testimony was believable, there was essentially no case against Hyman.  See Rivas, 687 F.3d at 543 (to prevail on innocence claim, petitioner's "credible new evidence" must "thoroughly undermine[ ] the evidence supporting the jury's verdict"); McQuiggin, 133 S. Ct. at 1936 ("The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error'") (quoting Schlup, 513 U.S. at 316).

The critical differences between the Schlup standard and sufficiency analysis bear reiteration because, in defending the conviction in the face of Ellis's hearing testimony, the state

resorts to what is essential a sufficiency arguing, asserting that, even "[d]iscounting Ellis's testimony . . . solely for the sake of argument, the remaining trial evidence" supports a verdict of guilt. Post-Hearing Memorandum of Law at 43 et seq. As the earlier-quoted passages from House and Schlup make clear: first, this Court must assess not merely at the *quantity* of the "remaining" trial evidence but also its *quality*, which includes its credibility; and second, the Court does not hypothesize a trial record from which incredible testimony is redacted but instead assesses how a rational juror would likely react *to the new material itself*.

There can be no room for argument: rational factfinders who journey through the trial record and are then exposed to the Second 440 and gateway hearing records could simply not have the requisite certainty about what actually happened, or the requisite confidence in the underlying investigation, to vote to convict Hyman of second-degree murder.

The loss of confidence in a case such as this is no small concern. Jurors sat through weeks of testimony and a parade of witnesses who, in light of all the new evidence, are to some degree suspect. For rational factfinders, the possibility that Ellis managed to deceive law enforcement draws renewed attention to the fact that Contreras withheld for two years the fact that she saw Whitmore armed, and to the dubious implied assertion about how the .45 and 9mm guns ended up in Whitmore's car. That fatal loose end, and other tenuous assertions relating to Whitmore, very much the elephant in the middle of the courtroom, would have to add up to reasonable doubt. Indeed, because an important component of Ellis's cross-examination was her denials of a Whitmore bias, her recant would likely breathe new life into the defense theory that

she and other witnesses may have slanted their accounts to promote the theme that Whitmore was the victim.  Factfinders thinking reasonably could well connect the dots.[63]

In sum, as the Supreme Court explained in <u>House</u>, the actual innocence "standard does not require absolute certainty about the petitioner's guilt or innocence," and the "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." 547 U.S. at 538.  <u>See</u> <u>also</u> <u>Rivas</u>, 687 F.3d at 545 (the "appropriate question" is not whether the new evidence "conclusively and definitively establish . . . innocence, but whether . . . a reasonable juror considering the entire mix of evidence in the case would more likely vote to acquit or to convict.").  The central theme of the Court's analysis is precisely that, in light of the new evidence, the requisite level of certainty about what likely occurred is not attainable.  Any rational factfinder properly instructed on reasonable doubt would, therefore, necessarily have to acquit.

## B.     Ineffective Assistance of Counsel

### 1.     Legal Standard

The general standards governing ineffective assistance of counsel claims are well established.  To show that the performance of counsel deprived him of his Sixth Amendment right, a petitioner bears the considerable burden of showing that "counsel's representation fell

---

[63] Whitmore himself described the 1540 building as one big family.  His mother was not merely a longtime building resident but also worked tenant patrol, so the closeness of her relationship with the victim and other tenant patrol trial witnesses Margaret Contreras and Lynn Burton speaks for itself.  Ellis was obviously close to Whitmore (she admitted that he wrote to her from prison, that she had a separate nickname for him, and that he was the father of her cousin's baby).  Even Deborah McCoy, who lived in a different building, was godmother to Whitmore's sister and chose Whitmore's mother as godmother to her own son.

below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688

(1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." Id. at 694.  On the deficiency prong,

"the [ ] inquiry must be whether counsel's assistance was reasonable considering all the

circumstances." Id. at 688.  The "court deciding an actual ineffectiveness claim must judge the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of

the time of counsel's conduct" and "must [ ] determine whether the [challenged conduct or

advice] were outside the wide range of professionally competent assistance." Id. at 690.

To prevail on an ineffectiveness claim that the state court has rejected on the merits, a

petitioner must show that "the state court applied Strickland to the facts of his case in an

objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002).   This is a

formidable burden: while "[s]urmounting Strickland's high bar is never an easy task," Padilla v.

Kentucky, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of Strickland

was unreasonable under § 2254(d) is all the more difficult [because] [t]he standards created by

Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review

is doubly so." Harrington  v. Richter, 562 U.S. 86, 105 (2011) (internal quotation and citation

omitted).  See also Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [state court]'s

decision is . . . doubly deferential [because] [w]e take a highly deferential look at counsel's

performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations

and citations omitted).  The Strickland standard, the Supreme Court has reminded district courts,

is "a general one" and, therefore, the "range of reasonable applications is substantial."

Harrington, 562 U.S. at 105.  Further, "habeas courts must guard against the danger of equating

unreasonableness under Strickland with unreasonableness under § 2254(d)." Id.  The difference

is crucial: "[w]hen § 2254(d) applies, the question is *not* whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standards." Id. (emphasis added). See also Pinholster, 563 U.S. at 196 (attorney need not state his reasons; rather, the court must "affirmatively entertain the range of possible reasons [] counsel may have had for proceeding as [he] did") (internal quotation marks omitted); Greiner v. Wells, 417 F.3d 305, 320 (2d Cir. 2005) (court must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

## 2.  Analysis

Having adjudicated countless section 2254 petitions in the two decades since AEDPA's announcement, the Court recognizes that, as a practical matter, this jurisprudence essentially requires denial of almost the ineffectiveness claims. Nevertheless, the Court finds that the formidable standards established by AEDPA have been met in this case.

The Second 440 court's conclusion that Brettschneider's decision not "to call the investigator as a rebuttal witness may well have been a tactical decision which will generally not be second guessed" is an unreasonable application of prong one of Strickland within the meaning of section 2254(d) because there is no articulable, reasonable, strategic reason to justify Brettschneider's action. Though manifest as a decision "not to call a witness," Brettschneider's decision was not merely that but was, in substance, a choice *not to introduce important exculpatory evidence.* Decisions not to introduce such evidence cannot be immunized by calling them "strategy" unless *some* strategy can be named: here, given the uniquely damaging nature of Ellis's testimony, the far reaches of human imagination cannot identify a legitimate strategy that would involve turning a blind eye to material with such potential to undermine that testimony,

and none has been suggested.  See, e.g., Pavel v. Hollins, 261 F.3d 210, 220 (2d Cir. 2001)

("[A]n attorney's failure to present available exculpatory evidence is ordinarily deficient, unless

some cogent tactical or other consideration justified it") (quoting Griffin v. Warden, 970 F.2d

1355, 1358 (4th Cir. 1992)); Wood v. Allen, 558 U.S. 290, 307 (2010) (Stevens, J., dissenting)

("A decision cannot fairly be characterized as 'strategic' unless it is a conscious choice between

two legitimate and rational alternatives").  Justice Holder's observation that counsel "cross-

examined [Ellis] aggressively as to her ability to observe and as to her motivation to lie,"

implying that counsel did enough, misses the point entirely.  His aggressive, accusatory

questions did not produce actual evidence that Ellis may have been lying.  His failure to

introduce the evidence he had is inexplicable strategically and therefore deficient performance.

Cf. Lopez, 915 F. Supp. 2d at 428-29 (decision to forego calling an alibi witness must be

deficient under Strickland unless justified by "some possible reason") (collecting cases).  See

also Casey v. Frank, 346 F. Supp. 2d 1000, 1016-17  (E.D. Wisc. 2004) (counsel was deficient in

failing to obtain predecessor counsel's investigative file on two exculpatory witnesses who

would have testified that a key trial witness lied when testifying that she saw defendant commit

crime; defendant was prejudiced because the testimony of the uncalled witnesses "would have

undercut the credibility of the state's major witnesses on the principal question at issue;" the

state court's rulings to the contrary therefore held to be an unreasonable application of

Strickland).

        More critically still, the effort to posit a rational strategy is a futile exercise here precisely

because the record strongly indicates that strategy had nothing to do with Brettschneider's

decision.  Rather, as the unrefuted affidavit alerted the Second 440 court, Brettschneider's

judgment was affected by his fee dispute with Hinkson.  Under clearly established Supreme

Court law, Brettschneider's failure to call Hinkson because of that fee dispute, or for any similar reason, is violation of the Sixth Amendment. See Strickland, 466 U.S. at 688 ("Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."); Wood v. Georgia, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000) ("A defendant's Sixth Amendment right to counsel includes a right to conflict-free representation") (internal quotations and citation omitted).[64]

The Second 440 court's decision essentially ignores the conflict aspect of Hyman's ineffectiveness claim and thus is contrary to the established Sixth Amendment jurisprudence. The most the Second 440 court did was acknowledge that Hyman's father's affidavit "present[ed] a question of fact" on the claimed fee dispute, but the court nevertheless denied a hearing to further explore the serious question, and altogether disregarded the conflict when concluding that Brettschneider did not render deficient performance.

The prejudice branch of the Second 440 court's decision, which concluded that Hyman "failed to show that counsel's deficient representation actually prejudiced him," is likewise unreasonable as a matter of fact and law. First, Strickland places conflict-of-interest claims outside the traditional "prejudice" requirement that a defendant show a reasonable probability of a different result but for counsel's error. See id. 466 U.S. at 692-93. Instead, under Strickland,

_____

[64] Of the four types of conflict-of-interest claims delineated in Armienti, Hyman's is in the "actual conflict" category: "actual conflict [exists] when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." Armienti, 234 F.3d at 824 (internal quotations and citations omitted).

the test is as follows: "not quite [a] per se rule of prejudice. . . [But] [p]rejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Id. at 692 (internal quotation and citation omitted). See also Armienti, 234 F. 3d at 824 ("To prove adverse effect, the defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."). Hyman's unrefuted affidavits showed precisely this, that the lawyer's interest in the fee dispute with Hinkson, rather than Hyman's best interests, corrupted his decision-making during trial. The state court's treatment of prejudice, therefore, is plainly contrary to Strickland.

Second, independent of the conflict aspect of Hyman's claim, Justice Holder's prejudice analysis is both an unreasonable application of the "prejudice" prong of Strickland and an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(1). Justice Holder opines that, had Brettschneider called Hinkson, "there is no way to know if the jury would have, at that stage, found his testimony so compelling as to discount the remainder of the People's case and acquit." The court's speculations are not justified, as the state had not presented any evidence rebutting Hinkson. Further, the court unreasonably failed to appreciate the pivotal role Ellis's testimony played in the state's case. Because of that role (as discussed throughout this opinion), had counsel successfully impeached Ellis, there is a more than reasonable probability that the result of the proceeding would have been different. See Strickland, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

**IV.    CONCLUSION**

For all of the foregoing reasons, Tully Hyman's petition for a writ of habeas corpus is granted.  Respondent is ordered to release Hyman within ninety days "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry" him.  Pavel, 261 F.3d at 29.  The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       July 13, 2016

                                    s/Raymond J. Dearie
                                    _____
                                    RAYMOND J. DEARIE
                                    United States District Judge